LAURA SCHWARTZ, Appellant, *v.* CHRISTOPHER SCHWARTZ, Respondent

No. 21010

June 6, 1991                                    812 P.2d 1268

*Cherry & Bailus,* Las Vegas, for Appellant.

*Joseph W. Houston, II,* Las Vegas, for Respondent.

---

[3]We have reviewed appellant's remaining contentions, and have determined that these arguments are without merit.

## OPINION

*Per Curiam:*

Appellant Laura Schwartz appeals the granting of respondent Christopher Schwartz' motion in a divorce proceeding to allow the custodial father to move with the couple's two small children to Pottsville, Pennsylvania, where Christopher's mother and family are located. After a two-day trial, the district court granted Christopher's motion and incorporated its ruling into the final divorce decree.

### Facts

Laura and Christopher were married on November 20, 1981. In 1988, serious marital problems developed between the couple. As a result, Laura was twice hospitalized for depression; she also attempted suicide with an overdose of anti-depressants. Christopher filed for divorce in November of 1988. At that time, he was awarded primary custody of their children, Debra and William ("Billy").

Prior to the time Christopher filed for divorce, Laura remained in the couple's Las Vegas home, caring for the two children. Christopher had been employed for three years as a casino

floorman where he earned an annual salary of $35,000. After the divorce, it appears that Laura worked as a cocktail waitress where she earned a minimum wage plus tips.

On three separate occasions during the course of custody proceedings, Laura accused Christopher or, equivocatingly, the husband of a babysitter, of sexually abusing Billy. As a result, Billy was placed in protective custody and numerous interviews by therapists and physicians followed. On the third round of accusations, state officials ordered lie detector tests. The parties stipulated that the test results could be used in court. Christopher's test showed no deception.[1] The polygraph examiner's evaluation of Laura's test indicated deception. The juvenile court subsequently found that Laura had lied in her reports of child abuse. As a result of these false allegations, the domestic relations referee recommended that Laura have supervised visitation rights.

In support of his motion for authorization to remove the children from this jurisdiction, Christopher stated that his mother owns a four-bedroom house in Pennsylvania which would accommodate a bedroom for each child. The grandmother, who is seventy-three years old, has an established relationship with the children. Christopher also testified that his mother is one of eleven children and that there would be an extended family of aunts and uncles within driving or walking distance in the event of a family emergency. In addition, Christopher is an only child and expects to some day inherit his mother's home.

## Legal Discussion

In this appeal, we are asked in a case of first impression to interpret NRS 125A.350, Nevada's "anti-removal" statute.[2] The

---

[1] It also appears from a review of the record that the babysitter's husband voluntarily took and passed a polygraph examination.

[2] NRS 125A.350, a new section added to the Nevada Revised Statutes in 1987, states:

If custody has been established and the custodial parent or a parent having joint custody intends to move his residence to a place outside of this state and to take the child with him, he must, as soon as possible and before the planned move, attempt to obtain the written consent of the other parent to move the child from the state. If the noncustodial parent or other parent having joint custody refuses to give that consent, the parent planning the move shall, before he leaves the state with the child, petition the court for permission to move the child. The failure of a parent to comply with the provisions of this section may be considered as a factor if a change of custody is requested by the noncustodial parent or other parent having joint custody.

overall purpose of such a statute is to preserve the rights and familial relationship of the noncustodial parent with respect to his or her child. *See* Holder v. Polanski, 544 A.2d 852, 855 (N.J. 1988) (citations omitted). As one court has stated, "it is 'in the best interests of a child to have a healthy and close relationship with both parents, as well as other family members.' " In re Marriage of Kutinac, 538 N.E.2d 862, 865 (Ill.App.Ct. 1989) (citing In re Marriage of Eckert, 518 N.E.2d 1041, 1045 (Ill. 1988)). The proper calculus involves a balancing between "the custodial parent's interest in freedom of movement as qualified by his or her custodial obligation, the State's interest in protecting the best interests of the child, and the competing interests of the noncustodial parent." *Holder*, 544 A.2d at 855.

Removal of minor children from Nevada by the custodial parent is a separate and distinct issue from the custody of the children. However, some of the same factual and policy considerations may overlap. In custody matters, the polestar for judicial decision is the best interests of the child. *See* NRS 125.480. In removing a child from the jurisdiction where the child currently lives, the best interests of the child should also be the paramount judicial concern. *See* In re Marriage of Kutinac, 538 N.E.2d 862, 865 (Ill.App.Ct. 1989); Ducheneaux v. Ducheneaux, 427 N.W.2d 122, 123 (S.D. 1988); D'Onofrio v. D'Onofrio, 365 A.2d 27, 29 (N.J.Super.Ct.Ch.Div. 1976). Determination of the best interests of a child in the removal context necessarily involves a fact-specific inquiry and cannot be reduced to a rigid "bright-line" test. *See* In re Marriage of Eckert, 518 N.E.2d 1041, 1045 (Ill. 1988) (citations omitted); Cooper v. Cooper, 491 A.2d 606, 614-15 (N.J. 1984).

Although this court has never established guidelines for the removal of children from this state, we are persuaded that the criteria adopted by D'Onofrio v. D'Onofrio, 365 A.2d 27, 30 (N.J.Super.Ct.Ch.Div. 1976), one of the leading cases in this area, is sound. Therefore, in determining the issue of removal, the court must first find whether the custodial parent has demonstrated that an actual advantage will be realized by both the children and the custodial parent in moving to a location so far removed from the current residence that weekly visitation by the noncustodial parent is virtually precluded.

If the custodial parent satisfies the threshold requirement set forth above, then the court must weigh the following additional

factors and their impact on all members of the family, including the extent to which the compelling interests of each member of the family are accommodated: (1) the extent to which the move is likely to improve the quality of life for both the children and the custodial parent; (2) whether the custodial parent's motives are honorable, and not designed to frustrate or defeat visitation rights accorded to the noncustodial parent; (3) whether, if permission to remove is granted, the custodial parent will comply with any substitute visitation orders issued by the court; (4) whether the noncustodian's motives are honorable in resisting the motion for permission to remove, or to what extent, if any, the opposition is intended to secure a financial advantage in the form of ongoing support obligations or otherwise; (5) whether, if removal is allowed, there will be a realistic opportunity for the noncustodial parent to maintain a visitation schedule that will adequately foster and preserve the parental relationship with the noncustodial parent.

In weighing and balancing the above factors, the court will, of course, have to consider any number of sub-factors that may assist the court in reaching an appropriate decision. For example, in determining whether, and the extent to which the move will likely improve the quality of life for the children and the custodial parent, the court may require evidence concerning such matters as: (1) whether positive family care and support, including that of the extended family, will be enhanced; (2) whether housing and environmental living conditions will be improved; (3) whether educational advantages for the children will result; (4) whether the custodial parent's employment and income will improve; (5) whether special needs of a child, medical or otherwise, will be better served; and (6) whether, in the child's opinion, circumstances and relationships will be improved. The foregoing list is by no means exhaustive, and is only illustrative of the many sub-factors that the court may, in the exercise of good common sense, feel the need to pursue prior to ruling on the issue of removal. In certain instances, the court may even conclude that a professional opinion or evaluation by a psychiatrist or psychologist will be desirable in assessing the impact of the move on a child.

Finally, as stated in *D'Onofrio,* "[t]he court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother [custodial parent] and children be forfeited solely to maintain weekly visitation by the father [noncustodial parent] where reasonable alternative visitation is available and where the advantages of the move are substantial." *D'Onofrio,* 365 A.2d at 30.

In the course of the proceedings below, the district court in effect carefully sought to apply the *D'Onofrio* guidelines we have adopted for this jurisdiction. As a result, the court found that the children would benefit from "a large and helpful extended family." *D'Onofrio*, 365 A.2d at 32. In addition, the father would be spared approximately $440 in child care expenses which could be used to benefit the children more directly. Christopher also stated that he and the children would be able to live with his mother rent-free, thereby increasing the amount of funds available for the children's needs.[3]

The judge rightly determined that it was in the best interests of the children not to be shuttled back and forth between paid baby-sitters with little family life until after 5:00 P.M. A review of the record reveals that the children were sometimes out of their home and in day care for up to ten hours a day. The district judge could reasonably conclude that the children would be more appropriately cared for by their grandmother.[4] The court did not find that the removal was motivated to defeat or frustrate visitation. Moreover, the court noted that it would continue to have jurisdiction and the power to enter future orders adjusting visitation.

Laura contends that the district court abused its discretion in allowing removal because Christopher had not found employment at the time of the move. We do not view this factor as determinative. The record reveals that Christopher had the formal skills to obtain employment and that he had never failed to support his family. Although at the time of the ruling Christopher had no definite employment in Pennsylvania, he held a college degree and had received previous training both as a stockbroker and as a real estate agent.

The district court determined that the preservation of the relationship with the noncustodial parent could be addressed appropriately by extended summer visitation instead of weekend visits. A reduction in visitation privileges is not necessarily determina-

---

[3]Both Laura and Christopher filed a Chapter 13 bankruptcy petition in 1987 before their separation. Christopher has assumed the payments on their five-year bankruptcy plan.

[4]Laura argues that the grandmother's age weighs against the best interests of the children. However, there is no evidence in the record suggesting that the grandmother is in ill health or suffers from a disabling condition. In any event, the grandmother was not viewed by the court as the custodial parent but rather as her son's helpmate in caring for the children.

tive. *See* In the Matter of Ehlen, 303 N.W.2d 808, 810 (S.D. 1981).

The visitation obstacles incident to distance and expense and their impact on Laura's continued relationship with her children were appropriately identified by the court as the most difficult and serious area of concern. However, as the court concluded, an expanded visitation period during the summer may serve as an effective substitute for weekend visits that can provide a realistic opportunity to nurture and renew the mother-child bond.[5] The court therefore ordered that Laura have the children for one month during summer vacations and that travel expenses be shared between Laura and Christopher in order to facilitate the summer visitation schedule. An uninterrupted sequence of time may prove more effective in bonding the relationship between the mother and her children than the weekend visits, at least under current circumstances.

Moreover, we do not agree that the district court abused its discretion by granting the removal motion and concomitantly ordering another psychological evaluation of Laura in order to determine whether visitation should be supervised. The court had the benefit of a twenty-three page child custody investigation report in making its decision. Substantial evidence supports the district court's order.

Additionally, although the court found that Laura sincerely loved her children, the court also found that the mother had an unfortunate, fairly recent history of mental illness which manifested itself during the initial separation. The judge was appropriately concerned about Laura's ability, during periods of illness, to provide full time care for her children. The judge was rightly concerned as to whether the mother could presently absorb the additional emotional, logistical and financial stress of being a single parent for any extended length of time. Sufficient evidence in the record, coupled with demeanor evidence considered by the court in the form of Laura's testimony and comportment in court, and her failure to comply with previous court orders, support the court's decision.[6] In addition, the district court judge was under-

---

[5]Reasonable and realistic visitation has been defined as "one that will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial parent if the removal is allowed." Cooper v. Cooper, 491 A.2d 606, 614 (N.J. 1984).

[6]The domestic relations referee had earlier determined that Laura was unable to pay the statutory minimum of $100 a child based on her current income. Although Laura has consistently exercised her visitation rights when available and maintained a continuous relationship with her children, Laura has not paid her court-ordered $179 monthly child support.

standably and justifiably disturbed by the evidence indicating that Laura would coach her three year old son into making false allegations of child abuse. Such conduct is extremely harmful to children and traumatic to those who are falsely accused, and cannot be tolerated.

The district judge properly ruled that moving the children would enhance their lifestyle, ameliorate the family's financial condition, and provide badly needed emotional stability for the children. Although a one-month summer visitation period is less than the period requested by Laura, prospects exist for expanding the visitation if the current schedule remains free of recurrent maternal misconduct and proves beneficial to the children.[7] The district court did not abuse its discretion in granting Christopher's motion.

Finally, Laura argues that the district court erred in not awarding her attorney's fees. The award of attorney's fees in divorce proceedings lies within the sound discretion of the trial judge. *See* Sogge v. Sogge, 94 Nev. 88, 89, 575 P.2d 590, 591 (1978) (citations omitted). In the instant case, Laura was responsible in part for the incurrence of attorney's fees because of the false accusations of child abuse and her failure to comply with child support orders.[8] Under the circumstances, it was not an abuse of discretion for the court to deny Laura's request for attorney's fees.

In sum, after a careful review of the entire record and for the reasons expressed above, we conclude that the district court did not err in its rulings and therefore affirm the judgment entered below.

---

[7]In the most recent court-ordered psychological evaluation of Laura in the record on appeal, Dr. Lewis Etcoff recommended that "the children live with her during the summer so that they can become reacquainted with their mother which is so very important, not only to their mother but even more important to them as children."

[8]This appeal is the culmination of protracted litigation between Laura and Christopher. The district court judge, counting some thirty-five different court appearances in the instant case, expressed dismay that the parents were "ambushing" each other through the courts "without really beginning to realize the detrimental effect on the children."