CHRISTI MARIE TRENT, Appellant, v. KENNETH ROBERT TRENT, Respondent.

No. 24741

March 2, 1995 890 P.2d 1309

*Stephen R. Minagil,* Las Vegas, for Appellant.

*Jolley, Urga, Wirth & Woodbury* and *Kathryn E. Stryker,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Appellant Christi Trent (Christi) and respondent Kenneth Trent (Kenneth) are divorced. They have joint legal custody of their son Corey, with Christi having primary physical custody. Christi

wishes to marry a man from Dover, Ohio, and move to Dover with Corey. Pursuant to NRS 125A.350, Christi sought permission from Kenneth to move with Corey. When Kenneth denied her request, Christi petitioned the district court for removal. The district court denied her petition, finding that Corey would lose a great deal if he moved to Dover. For the following reasons, we reverse the order of the district court and remand with instructions to grant Christi's petition.

## FACTS

Christi and Kenneth separated in March, 1991, and divorced on August 5, 1992. Pursuant to the parties' settlement agreement, Christi and Kenneth share joint legal custody of their minor son, Corey; Christi has primary physical custody.[1] Kenneth, in turn, pays $400 per month in child support and maintains health insurance for Corey. The settlement agreement grants Kenneth reasonable visitation rights, including every other weekend, two days during the week, four weeks during the summer, and certain holidays.

At the time the district court considered this matter, Christi was taking care of Corey on Monday, Tuesday, and Wednesday and was working on Thursday, Friday, and Saturday. On Thursday and Friday, Kenneth's sister was caring for Corey from 8:00 a.m. until approximately 3:00 p.m., when Kenneth finished work for the day. Kenneth was taking care of Corey on alternating weekends (including Friday nights) and some additional Saturdays and Saturday nights, in light of Christi's work schedule.

Kenneth was born and raised in Las Vegas, and his mother, father, sister, brother, four uncles, three aunts, and numerous cousins live in Las Vegas. Kenneth works as a construction electrician and has been employed by the same company for approximately seven years. His gross monthly income is approximately $4,167. Kenneth presently lives in a condominium, but he owns a lot that is adjacent to his sister's house and plans to construct a house on this lot.

Christi was raised in Las Vegas, and her mother, father, sister, brother-in-law, nieces, and nephews reside in the Las Vegas area. When the district court considered this matter, Christi lived in an apartment without security and had fears about her safety.[2]

---

[1]Corey was born on November 4, 1990.

[2]Some time after the district court hearings, Christi moved from her apartment to her sister's house. She and Corey now reside with her sister, brother-in-law, and their four children. The garage has been converted to living space for Christi and Corey, and Christi pays $200 per month for rent and utilities.

Christi works as a manicurist three days per week and makes $1,000 per month from this employment. At the time this matter was heard, Christi's rent was $550 per month, and she was unable to save money. She was forced to borrow money from her parents on occasion.

In May of 1992, Christi met Douglas Albert (Douglas), who is from Dover, Ohio, while he was visiting Las Vegas. She has visited Douglas in Dover on numerous occasions (on four of these visits, Corey accompanied her). Douglas, in turn, has visited Christi and Corey in Las Vegas. Since they first met, Christi and Douglas have visited each other nine times, each time for approximately one week. In addition, Christi and Douglas speak to each other over the telephone two or three times per day.

Douglas is a homeowner and is vice-president of his family's construction company. In addition, most of Douglas's family members reside in or near Dover. Christi and Douglas want to be married, and Christi desires to move, with Corey, to Dover. Douglas's income is more than sufficient to support Christi and Corey, and Christi will stay home with Corey if she marries Douglas and moves to Dover.[3] If Christi is not permitted to take Corey to Dover, she will then remain with Corey in Las Vegas.

Travel time from Las Vegas to Dover by aircraft and automobile is approximately six and one-half hours: a direct flight from Las Vegas to Columbus, Ohio, takes approximately four and one-half hours,[4] and the Columbus airport is one and one-half to two hours from Dover by automobile. In light of the distance, Christi has proposed that Kenneth's visitation time with Corey be modified so that Corey visits Kenneth for three one-week periods during the year and four weeks in the summer, with Corey's visits to increase by one week each year. Christi has also offered to split the cost of plane tickets with Kenneth and to serve as Corey's travel companion.

At the hearing, Kenneth introduced the testimony of Dr. Elizabeth Richett, a licensed clinical psychologist, who had examined Kenneth and Corey on January 19, 1993. Dr. Richett reported that Corey and Kenneth appear to have "a warm and close bond" and that Corey exhibited appropriate behavior for a two year old. Dr. Richett also testified that boys less than five years old who are separated from their fathers often experience increased aggression and "non-compliant acting out behavior at

---

[3]In 1991, Douglas earned $61,934.76. In 1992, Douglas earned $101,441.

[4]At the time of the district court hearings, a round trip ticket cost approximately $250.

home," possibly because they are confused about the loss and feel somehow responsible. She added that if Corey were able to bond with Douglas, any such negative effect of his separation from Kenneth might be mitigated. In addition, Dr. Richett opined that some children are unable to bond with a stepparent if they feel guilty about "abandoning" the natural parent.

At the conclusion of the hearing, Judge Marren ruled that both parties had acted in good faith. He also determined that the move would undoubtedly improve Christi's financial situation and that Corey's housing and environmental living conditions would probably improve. However, he found that Corey's positive family care and support, including that of the extended family, would not be enhanced.

Judge Marren also explained that early in his career, he had been separated from his two year old son for approximately four months and that this separation greatly strained their relationship. He opined that because of Corey's young age, Corey would either feel that Kenneth had betrayed him or would replace Kenneth with Douglas.[5]

On March 10, 1993, the court entered its findings of fact and conclusions of law, in which it denied Christi's motion. In its findings and conclusions, the court determined that "[f]ollowing [the parties'] separation, Kenneth Trent maintained frequent and substantial contact with Corey, and had visitation every weekend, at a minimum. This schedule of substantial contact continued after the parties' divorce was finalized . . . ."

Additionally, the court found:

> Although Christie Trent has demonstrated that an actual advantage will be realized by Christie Trent should she relocate to Dover, Ohio, she has not clearly demonstrated that the parties' minor child will also realize such an advantage. It is clear . . . that Christie Trent would comply with substitute visitation orders issued by the court, and that Christie Trent's financial outlook will improve. On the other hand, it is also clear . . . that the positive family care and

[5]Christi contends that Judge Marren improperly injected his own child raising experiences into the proceedings. We reject this contention. Although the district judge did recount his own separation experience, this personal experience was not mentioned in the court's findings of fact and conclusions of law. Second, the court's statement that Corey would either feel betrayed by Kenneth or would replace Kenneth with Douglas is supported by Dr. Richett's testimony. Finally, a judge who is acting as the fact finder must necessarily bring some real life experiences into the courtroom. *See, e.g., In re Inquiry Concerning a Judge*, 357 So.2d 172, 178 (Fla. 1991).

support, including that of the extended family, will not be enhanced by the move, and that there will not be a realistic opportunity for the non-custodial parent to maintain a visitation schedule that will adequately foster and preserve the parental relationship with the non-custodial parent should the move be allowed. No educational advantage has been demonstrated, and the child has no special needs which could be addressed.

The court also based its decision on the substantial, regular contact between Kenneth and Corey, Corey's gender and young age, Corey's close relationship with Kenneth's sister, Corey's relationship with other extended family members, and the "short length of time that Christie Trent has known Douglas Albert, and the small amount of time they have spent together since meeting."

In weighing these factors, the court concluded that Corey stood to lose a great deal if the relocation to Ohio were allowed and that relocation was not in Corey's best interest. This timely appeal followed.

## DISCUSSION

Christi contends that the district court abused its discretion in denying her motion. Specifically, Christi asserts that under the court's reasoning, a custodial parent will be prevented from leaving Nevada unless the noncustodial parent has little or no relationship with the child.

Under NRS 125A.350, a custodial parent who intends to move with the child to a location outside of Nevada must attempt to obtain the other parent's written consent. If the other parent refuses permission, then the parent planning to move must petition the court for permission to move the child.

This court first interpreted NRS 125A.350 in Schwartz v. Schwartz, 107 Nev. 378, 812 P.2d 1268 (1991). In Schwartz, we explained that the statute's "overall purpose . . . is to preserve the rights and familial relationship of the noncustodial parent." Id. at 382, 812 P.2d at 1270. In summarizing the district court's role in evaluating a move, we explained that "[t]he proper calculus involves a balancing between 'the custodial parent's interest in freedom of movement as qualified by his or her custodial obligation, the State's interest in protecting the best interests of the child, and the competing interests of the noncustodial parent.'" Id. at 382, 812 P.2d at 1270 (quoting Holder v. Polanski, 544 A.2d 852, 855 (N.J. 1988)).

In addition, Schwartz provides guidelines for the district court to follow. Schwartz, 107 Nev. at 382-83, 812 P.2d at 1271-72. In

considering a motion for permission to move a minor child from Nevada, the district court must first determine "whether the custodial parent has demonstrated that an actual advantage will be realized by both the children and the custodial parent in moving to a location so far removed from the current residence that weekly visitation by the noncustodial parent is virtually precluded." *Id.* at 382, 812 P.2d at 1271. If the custodial parent satisfies this threshold requirement, then the court must consider: the extent to which the move is likely to improve the quality of life for both the children and the custodial parent; whether the custodial parent's motives are honorable, and not designed to frustrate or defeat visitation rights accorded to the noncustodial parent; whether, if permission to remove is granted, the custodial parent will comply with any substitute visitation orders issued by the court; whether the noncustodian's motives are honorable in resisting the motion for permission to move; and whether, if removal is allowed, there will be a realistic opportunity for the noncustodial parent to maintain a visitation schedule that will adequately foster and preserve the parental relationship with the noncustodial parent. *Id.* at 383, 812 P.2d at 1271.

We find it disturbing that despite our decision in *Schwartz,* many district courts are using NRS 125A.350 as a means to chain custodial parents, most often women, to the state of Nevada. NRS 125A.350 is primarily a notice statute intended to prevent one parent from in effect "stealing" the children away from the other parent by moving them away to another state and attempting to sever contact.[6] Given the legislative purpose behind NRS 125A.350, it should not be used to prevent the custodial parent from freely pursuing a life outside of Nevada when reasonable alternative visitation is possible. Because the record in this case shows that Douglas and Christi would be financially capable of sending Corey for frequent visits with Kenneth, we feel that the bond between Kenneth and Corey can be adequately preserved if the move is allowed.

In our recently issued opinion in Jones v. Jones, 110 Nev. 1253, 885 P.2d 563 (1994), we stated that once the custodial parent shows a sensible, good faith reason for the move, the

---

[6]The bill that became NRS 125A.350 (A.B. 874) was introduced to the legislature as a bill to prevent "embittered" ex-spouses from unjustifiedly taking the child to another location without having the best interests of the child in mind. Hearing on A.B. 874 Before the Assembly Judiciary Committee, June 9, 1987, p. 2. The legislator introducing the bill explained that it would simply present a forum for discussion on the issue. Other legislators raised concerns about the difficulty this bill would present for the custodial parent in terms of time and money, and about the restriction of the custodial parent's right to travel.

district court should consider the other *Schwartz* factors, focusing on the availability of adequate, alternate visitation. The district court in this case focused on the strength of the bond between Kenneth and Corey and on maintaining the existing visitation pattern, thus failing to consider whether reasonable, alternative visitation was possible.

Christi desires to marry Douglas and live with him, a good faith reason for moving. Moreover, Christi showed that both her and Corey's standard of living will be drastically improved if she is permitted to move to Dover and marry Douglas. Presently, Christi makes only $1,000 per month and can barely afford a place to live for her and Corey. Christi indicated that she and Corey have been living in a converted garage. In contrast, Douglas is a homeowner with substantial earnings. He will be able to offer Christi and Corey numerous opportunities not available to them in Nevada. Thus, Christi made the actual advantage threshold showing required by *Schwartz*.

Additionally, the other factors weigh in favor of Christi. The district court found that Christi had a good faith reason for moving, that she would comply with substitute visitation orders, and that Corey and Christi's living conditions and economic status would be improved by the move. Given the evidence in the record regarding Douglas's financial situation, there is no reason that Christi should have to remain unwillingly in the State of Nevada.

In *Schwartz,* we noted:

> "The court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother . . . and children be forfeited solely to maintain weekly visitation by the father . . . where reasonable alternative visitation is available . . . ."

Schwartz v. Schwartz, 107 Nev. 378, 383, 812 P.2d 1268, 1271-72 (quoting D'Onofrio v. D'Onofrio, 365 A.2d 27, 30 (N.J. Super. Ct. Ch. Div. 1976)). Reasonable and realistic visitation is visitation that " 'will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial parent if the removal is allowed.' " *Schwartz,* 107 Nev. at 385 n.5, 812 P.2d at 1272 n.5 (quoting Cooper v. Cooper, 491 A.2d 606, 614 (N.J. 1984)). In Jones v. Jones, 110 Nev. 1253, 885 P.2d 563 (1994), we noted that the need for a modification to the existing visitation schedule does *not* mean that the move should be denied, stating:

> "If either is to sacrifice in this respect, there is indeed less reason to demand the sacrifice to be made by the custodial parent since it is she in the end who must arrange her life in a manner consistent with the day-to-day burdens of simultaneously raising a child and pursuing a career."

*Id.* at 1263-64, 885 P.2d at 570 (quoting Helentjaris v. Sudano, 476 A.2d 828, 832 (N.J. Super. Ct. App. Div. 1984)); *see also* Kaneski v. Kaneski, 604 A.2d 1075 (Pa. Super. Ct. 1992) (stating that once real advantages to the custodial parent and children have been shown, it becomes necessary to shift visitation arrangements so long as reasonable substitute visitation is available); In Re Marriage of Zamarippa-Gesundheit, 529 N.E.2d 780, 783 (Ill. App. Ct. 1988) (stating that although the father would prefer consistent day-to-day contact with the child, this preference was insufficient to chain the mother to the State of Illinois); Auge v. Auge, 334 N.W.2d 393, 397-98 (Minn. 1983) (removal may not be disallowed solely to maintain the existing visitation patterns).

The district court based its denial of the move on Kenneth's frequent contact with Corey and its finding that there would not be a realistic opportunity for Kenneth and Corey to maintain their relationship if Corey moved to Dover. The record shows, however, that Douglas is financially well-off enough that Christi should be able to pay for airline tickets to send Corey to see Kenneth regularly. Christi stated that given Corey's young age, she would fly back and forth with him for visits. Thus, we feel that there would be an adequate opportunity for Kenneth and Corey to maintain their relationship. *See Schwartz,* 107 Nev. at 385, 812 P.2d at 1272 (concluding that expanded summer visitation, instead of weekend visits, can serve to maintain the parent-child bond).

Accordingly, we reverse the order of the district court and remand with instructions to grant Christi's petition for removal.[7]

---

[7]THE HONORABLE THOMAS L. STEFFEN, Chief Justice, did not participate in the decision of this appeal.