PENNY ELLENWOOD COOK, Now Known as PENNY ELLENWOOD GREEN, Appellant, v. ROBERT ANTHONY COOK, Respondent.

No. 26360

June 27, 1995

898 P.2d 702

*Skelly and Sheehan,* Reno, for Appellant.

*Robert C. Bell,* Reno, for Respondent.

## OPINION

*Per Curiam:*

Penny Green and Robert Cook are the divorced parents of their minor child, Cassandra ("Cassie"). At the time of their divorce, Penny and Robert agreed that they would share joint legal custody of Cassie and that Penny would retain sole physical custody of the child. Penny has remarried since the divorce and desires to move with her new husband and Cassie to Louisiana. Pursuant to NRS 125A.350, Penny filed a motion seeking the district court's permission to remove Cassie from Nevada to Louisiana. Robert opposed the motion. The district court denied the motion on grounds that Cassie's move to Louisiana would harm her relationship with her father. For the reasons that follow, we reverse and remand with instructions to grant Penny's motion.

### FACTS

Cassie was born to Penny Cook, now known as Penny Green, and Robert Cook, in 1987. In 1990, Penny and Robert entered into a joint petition for summary divorce and signed a marital settlement agreement providing the parents with joint legal custody of Cassie and Penny with sole physical custody of the child subject to Robert's reasonable right of visitation.

In 1992, communications between Robert and Penny began to deteriorate when Robert requested that Cassie be allowed to accompany him and his fiancée to England for their wedding. The dispute was ultimately settled in favor of Robert at a conference with the district judge. Since that time, however, the relationship between Robert and Penny has been very strained. Penny, believing that the tension was affecting Cassie, sought professional counseling for her with Dr. Stephanie Dillon.

Dr. Dillon diagnosed Cassie as being clinically depressed, and related that diagnosis to Penny. Robert was included in the counseling process, but Dr. Dillon concluded that his anger against his ex-wife made it difficult for him to focus on Cassie's problems. To complicate matters, Penny contacted Robert regarding payment for Dr. Dillon's services, thus provoking Robert to anger and a lack of response. From that point on, the antagonism between Penny and Robert has intensified regarding every conceivable issue pertaining to Cassie's well-being.

In March 1993, Robert claimed to have noticed bruising on Cassie's lower body, her upper thighs, her buttocks, and the

small of her back. Robert accused Penny's husband, Mr. Green, of physically abusing Cassie and derided the filthy living conditions at the Green household. Robert also claimed that Cassie acknowledged being beaten by Mr. Green, and that Mr. Green had been bathing with her in the nude. Robert said that the child requested that she be allowed to move in with him.

Irene McGaughey of the Department of Social Services investigated Robert's claims, however, and concluded that the claims of child abuse were unsubstantiated and that living conditions at the Green home were adequate. Robert nevertheless filed a motion to modify the divorce decree, requesting that physical custody of Cassie be transferred to him. Robert supported his request with the same unsubstantiated allegations that prompted the previous investigation by the Department of Social Services. He also complained that Cassie was often dirty, with rashes around her genital and buttocks areas due to lack of proper hygiene. Moreover, he claimed that the child had developed a chronic vaginal infection. Additionally, he questioned Penny's decision to teach Cassie at home even though Penny never graduated from high school.

Robert's motion to modify the divorce decree never proceeded to hearing as the parties stipulated to the withdrawal of the motion in consideration of a modified visitation schedule and agreement that the parties participate in mediation. In 1994, during the mediation process, both Penny and Mr. Green were offered supervisory positions with Boomtown Westbank, a riverboat gambling operation in Harvey, Louisiana.

Robert adamantly opposed moving Cassie to Louisiana with Penny and Mr. Green. Penny consequently filed a motion to allow her to move Cassie to Louisiana, and to modify the divorce decree to "grant liberal visitation rights to non-custodial parent" and "to allow a deviation of the non-custodial parent's child support obligation to accommodate cost of transportation of the child to and from visitation." Robert opposed the motion and renewed his motion to modify the divorce decree. Robert alleged that Penny had stipulated to mediation knowing full well that she planned to move to Louisiana. The Greens, however, claimed to have learned of the opportunity in Louisiana about halfway through the third and fourth mediation sessions.

Robert thereafter made another report to the Department of Social Services regarding filth and stench at the Green residence caused by dirty diapers and animal feces. Ms. McGaughey, again visiting the Green home, found Robert's report to be without foundation.

Penny's motion to remove Cassie to Louisiana proceeded to hearing. In preparation for the hearing, the district court appointed Earl S. Nielsen, Ph.D., to conduct an independent

psychological evaluation of Cassie. At the hearing, Dr. Nielsen testified that Cassie has a strong bond with both her mother and father and fears neither. He testified further that Penny and Robert are "more disparate in their value systems than most couples" and that "the child lives in the middle." He ultimately opined that because of the constant bickering and fighting between Penny and Robert, the further apart the visitation transitions, and the longer the visitation periods, the better it would be for Cassie. This opinion was based on what Dr. Nielsen referred to as a "transition syndrome," meaning that Cassie was forced to alter her behavior in the presence of each parent, and that the greater the frequency of this alteration the more harmful it would be for the child. Dr. Dillon was also called to testify and expressed a similar opinion.

In addition to the foregoing experts, Robert called Patrick J. Colletti, M.D., to testify regarding Cassie's vaginal infection, which he had treated. Dr. Colletti testified that Cassie appeared extremely withdrawn during the examination and that he unilaterally chose to call the district judge about his concerns, knowing of the case pending before the court. Moreover, Dr. Colletti expressed his opinion that a move to Louisiana would be very difficult for Cassie. He specifically stated, "I think the child needs to see both parents on a regular basis for a normal relationship to evolve," and "I think children, if any way could be worked out . . . should have adequate time with both parents to develop a normal parental bond." Dr. Colletti also commented on photographs depicting bruising on Cassie's back that had been presented to him by Robert. Specifically, Dr. Colletti testified that they were of no medical, legal significance because "they weren't properly done and the child wasn't properly looked at, at that point."

The district court later issued a written order denying both Robert's motion to modify the divorce decree and Penny's motion to remove Cassie to Louisiana. Relevant portions of the decision appear in Appendix A to this opinion. Suffice it to note here that the district court found both Robert and Penny fit parents who shared an abnormal hostility for each other, and who were insufficiently attuned to the effects of their behavior on Cassie; nevertheless, Cassie had developed a resiliency that enabled her to adjust her approach to the differing attitudes in her father's and mother's homes.

The district court found that one of the critical aspects of Cassie's relationship with her father was the regular and ongoing nature of their relationship. The court also found that Robert had not demonstrated that Cassie was the subject of any abuse or neglect whatsoever. Looking to the child's best interests, the court ruled that Cassie should remain in the primary custody of

Penny, reserving to Robert visitation periods of eight consecutive days on a monthly basis and two afternoons of his choice during the remainder of the month.

Penny appeals the district court's order denying her motion to remove her daughter to Louisiana.

## DISCUSSION

Interpreting NRS 125A.350,[1] this court has specified factors to be considered when deciding whether a custodial parent should be permitted to move a child out of state. *See* Schwartz v. Schwartz, 107 Nev. 378, 382-83, 812 P.2d 1268, 1271-72 (1991). The family court or district court, as the case may be, must first reach the threshold issue of "whether the custodial parent has demonstrated that an actual advantage will be realized by both the children and the custodial parent in moving to a location so far removed from the current residence that weekly visitation by the noncustodial parent is virtually precluded." *Id.* at 382, 812 P.2d at 1271. If the custodial parent satisfies the threshold requirement, the court must then weigh the following additional factors and their impact on all members of the family, including the extent to which the compelling interests of each member of the family are accommodated: (1) the extent to which the move is likely to improve the quality of life for both the children and the custodial parent; (2) whether the custodial parent's motives are honorable, and not designed to frustrate or defeat the noncustodial parent's visitation rights; (3) whether, if permission to remove is granted, the custodial parent will comply with revised visitation orders issued by the court; (4) whether the noncustodial parent's motives are honorable in resisting permission to remove, or to what extent, if any, the opposition is intended to secure a financial advantage regarding ongoing support obligations or otherwise; and (5) whether removal will provide realistic opportunities for the noncustodial parent to have visitation rights that will adequately foster and preserve the

---

[1]NRS 125A.350 reads as follows:

If custody has been established and the custodial parent or a parent having joint custody intends to move his residence to a place outside of this state and to take the child with him, he must, as soon as possible and before the planned move, attempt to obtain the written consent of the other parent to move the child from the state. If the noncustodial parent or other parent having joint custody refuses to give that consent, the parent planning the move shall, before he leaves the state with the child, petition the court for permission to move the child. The failure of a parent to comply with the provisions of the section may be considered as a factor if a change of custody is requested by the noncustodial parent or other parent having joint custody.

noncustodial parent's relationship with the children. *Id.* at 383, 812 P.2d at 1271-72.

We recently refined our *Schwartz* decision, summarizing the standard for removal as follows:

> [A] custodial parent seeking removal does not need to show a significant economic or other tangible benefit to meet the threshold "actual advantage" showing. If the custodial parent shows a sensible, good faith reason for the move, the district court should evaluate the other factors enumerated in *Schwartz*, focusing on whether reasonable, alternative visitation is possible. If reasonable, alternative visitation is possible, the burden shifts to the noncustodial parent to show that the move is inimical to the children's best interests. . . .
>
> We feel that this allocation of burdens is consistent with the evaluation process enunciated in *Schwartz* and is the most equitable way of balancing the interests of the children and the noncustodial parent, while giving the custodial parent the right to reasonable freedom to pursue his or her life.

Jones v. Jones, 110 Nev. 1253, 1266, 885 P.2d 563, 572 (1994).

Penny opposes the district court's conclusion that Cassie's loving relationship with Robert is perhaps sufficient under *Schwartz* to deny her motion. Penny maintains that she met her threshold burden of proving an "actual advantage," because she and her new husband have been offered supervisory positions in Louisiana at significantly higher salaries. She also contends that the evidence with respect to each of the secondary *Schwartz* factors is favorable to her position.

Robert counters that the district court properly determined that there would be no actual advantage to allowing Penny to move Cassie to Louisiana. This conclusion, argues Robert, is supported by Dr. Nielsen's testimony concerning the special bond that exists between him and his daughter. Robert also insists that his position predominates with respect to the secondary *Schwartz* factors. Finally, assuming that Penny has met her threshold burden, and that the burden of proof has shifted to Robert, he concludes: (1) that the record establishes that a move to Louisiana would not be in Cassie's best interest, because it would harm Cassie's relationship with him; and (2) that although the investigation by the Department of Social Services did not confirm negative claims against the Greens, the record clearly indicates instances of abuse that should be factored into the equation of Cassie's best interests.

We recently expressed our concern that, despite our decision in *Schwartz*, many courts are using NRS 125A.350 as a means to

chain custodial parents, most often women, to the state of Nevada. *See* Trent v. Trent, 111 Nev. 309, 315, 890 P.2d 1309, 1313 (1995). Given the legislative purpose behind the statute, "it should not be used to prevent the custodial parent from freely pursuing a life outside of Nevada when reasonable alternative visitation is possible." *Id.*

As in other recent cases involving the application of NRS 125A.350, the lower court's reasoning underlying its decision to deny Penny's motion again fails to fully consider the standard set forth in *Schwartz*, as refined by *Jones*. Although it is apparent from the record that the father and daughter have a very close relationship, that relationship standing alone, upon which the district court apparently based its ruling, was insufficient to deny Penny's motion. The district court should have first considered the actual advantage threshold, and then evaluated the other *Schwartz* factors, focusing on whether reasonable, alternative visitation is possible.

In terms of the "actual advantage" threshold, Penny's desire to accept what amounts to a promotion, a higher salary, and a higher standard of living for Cassie is a sensible, good-faith reason to move to Louisiana. Penny therefore met her initial burden of proof. Our assessment with respect to each of the *Schwartz* secondary issues also favors Penny. First, expert testimony clearly established that the move would greatly lessen the potential for the severe tension between Penny and Robert to adversely impact Cassie. Robert's contentions respecting this issue are unsubstantiated and ignore the facts of record. Second, there is no indication that Penny's motives are other than honorable. Robert's contention that Penny's desire to move to Louisiana was precipitated by his allegations of child abuse and his petition for custody change is unsupported by the facts. Third, there is no indication that Penny will refuse to comply with revised visitation orders. As with the custodial spouse in *Jones*, Penny has agreed to submit to Nevada jurisdiction over custody matters even after the move. *See Jones*, 110 Nev. at 1263, 885 P.2d at 570. Fourth, Robert appears to be resisting the move because he does not want to be separated from his daughter. Such a motive is certainly understandable, and bespeaks Robert's love for his daughter, despite the fact that his allegations of child abuse were unsubstantiated and that, as noted by the district court, "Robert seems more concerned about building a case of abuse against his former wife than an honest effort to look to the welfare of his daughter." Although there is some evidence in the record that justifies Robert's concern about Cassie's well-being, in light of the applicable standard and the evidence belying abuse,

those concerns are insufficient to tip the scale in Robert's favor. Fifth, Penny has proposed liberal visitation rights for Robert and has offered to contribute to the cost of transporting Cassie to Nevada.

Penny has therefore met her burden under *Schwartz* and *Jones*. Furthermore, Robert has failed to present compelling reasons why the move would be adverse to Cassie's best interests. There is no apparent reason why, consistent with the spirit of *Schwartz* and *Jones*, an alternative visitation schedule may not be devised by the court that will preserve the loving relationship between father and daughter, and minimize the transitional difficulties that Cassie has faced with frequent moves from one parent's home to the other.

One of the tragic aftermaths of the dissolution of families is that the environmental, physical, and temporal relationships between parents and their children must change in ways that tear at the heartstrings. Until parental commitments to one another and their children become more enduring, the best society can hope for is that parents will suppress feelings of rancor against one another in favor of the future well-being and happiness of their children.

In light of this opinion, other issues raised by Penny need not be addressed.

## CONCLUSION

For the foregoing reasons, we conclude that the district court abused its discretion in denying Penny's motion to remove Cassie to Louisiana. Accordingly, we reverse and remand with instructions to grant Penny's motion and to establish a liberal visitation schedule and adjusted child support payments that will safeguard and preserve Robert's relationship with his daughter and that are otherwise consistent with the dictates of this opinion.

## APPENDIX A

The Court should start out by pointing out that by themselves, both of these people are fit and proper persons to have care, custody and control of their daughter. Cassie is a resilient person who thrives in a loving and compassionate environment and both homes are able to provide such an environment for her.

That finding alone might be fatal under *Schwartz* to the mother's efforts to move because the Court finds that Cassie has established an important, regular relationship with her father that would be diminished if she were required to visit with her father only on major holidays because of the distance between Reno and Louisiana.

. . . [Penny argues] that Cassie will remain in some kind of a figurative "ball mill" if she is required to remain here in Reno, where she would be ground back and forth between her mother's goals, aspirations and fears and those of her father. In fact, this kind of unusual antipathy *does* exist between the parents of this unfortunate six year old.

By making unsubstantiated reports to the police and social services, Robert seems more concerned about building a case of abuse against his former wife than an honest effort to look to the welfare of his daughter.

For her part, Penny Green seems bent upon minimizing Mr. Cook's importance to his daughter as a shaping force in her life, showing very little sensitivity or insight into the true source of his daughter's distress before, during and after exchanges—a child struggling to please two people who, as Stephanie Dillon testified, is 50% her mother and 50% her father. The mother instead points to some nameless dysfunction in the Cook household as the culprit.

These are two people who have an abnormal hostility toward each other—abnormal, as Dr. Nielsen testified, even for divorced parents in a custody battle. "Pathological" would not be too strong a word to describe the vested disrespect there [sic] two people have for each other. Cassie has two parents who can't agree on much of anything.

. . . .

The Court was startled to find that emerging from the ashes of this relationship between her parents is a pretty, precocious, and most of all, a reasonably stable and healthy phoenix of a girl.

Not always that way, she was clinically depressed (a rarity for a (then) five year old) until she figured out that she could program herself one way to please her mom and another way to please her dad and, for the most part, remove herself from the center of the storm.