727 So.2d 104 (1999)
Ex parte Ted A. MONROE.
(Re Judith Monroe Mayhew v. Ted A. Monroe).
1971344.
Supreme Court of Alabama.
January 8, 1999.
T.J. Carnes of Carnes & Carnes, P.C., Albertville, for petitioner.
William P. Burgess, Jr., Huntsville, for respondent.
HOOPER, Chief Justice.
Ted A. Monroe and his wife Judith were divorced by the Marshall Circuit Court. That court gave the wife custody of their minor son, based on an agreement of the husband and wife. The father later petitioned for a change of custody, on the basis that the wife was moving to Michigan. The trial court modified its custody award so as to place the child with the father if the mother moved to Michigan. The Court of *105 Civil Appeals reversed that custody modification. Mayhew v. Monroe, 727 So.2d 101 (Ala.Civ.App.1998). We granted the father's petition for certiorari review. We reverse the judgment of the Court of the Civil Appeals and reinstate the custody-modification order of the circuit court.
Ted Monroe and Judith Monroe (now Judith Monroe Mayhew) were married in 1985. Their son was born in 1990. The father was allowed visitation at least 26% of the time. However, the record indicates that before the father petitioned for a change of custody, the child was spending at least half of his time with his father. The child has a very close relationship with the extended family of his mother and with that of his father as well, and all members of the child's extended families reside in the area of Marshall County, where the child has been reared.
The mother informed the father in October 1996 that she would be moving to Michigan in January 1997, taking a job there, and taking the child with her. On November 19, 1996, the father petitioned the Marshall Circuit Court for a change of custody. According to the mother's testimony at the hearing on the question of custody modification, she was at that time working as a Federal employee at Redstone Arsenal, a facility of the United States Army. She testified that she had been informed that her job at Redstone Arsenal was ending and that there were several locations where she could take another job similar to her current oneHuntsville, Alabama; Columbus, Ohio; Battle Creek, Michigan, and a location in Georgia. The mother testified that she had been told later that she was being reassigned to Battle Creek, Michigan. The record indicates that at that time the mother's boyfriend resided in Battle Creek, Michigan.
The father's modification petition asked that general custody be placed with him, given that the mother had indicated she would be moving to Battle Creek, Michigan, and taking the child with her. The court entered an order modifying the custody provision so that if the mother moved to Michigan as she had planned, custody would be moved to the father, subject to the mother's right to visitation.
The trial court reasoned that if the mother was allowed to take the child to Michigan, then it was quite conceivable that the child's father and the child's extended families would no longer be in close contact with him.
The child, according to the evidence presented, has an unusually close relationship with his father and with the child's extended families, and the evidence indicated that a sudden absence of contact with them could detrimentally affect him. The trial judge heard evidence indicating that if the child moved to Michigan with his mother he would become separated from everyone and everything in his life that he was familiar with, except his mother.
In the modification proceeding, the trial court applied the standard set out in Ex parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984):
"The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. The parent seeking the custody change must show not only that [he or] she is fit, but also that the change of custody `materially promotes' the child's best interest and welfare."
Judge Gullahorn granted the change of custody following an ore tenus proceeding. He stated that the mother and the father were both exemplary parents, and he based his order solely on the effects the mother's proposed move would have on the child. The mother stated that if she had to choose between losing custody and staying in Alabama, then she would stay in Alabama. The mother also testified that she could, but has not, sought other employment in the same area.
In his modification order, the trial judge stated:
"[I]t would be in the child's best interest to transfer custody to the [father] and ... the benefits of remaining in close contact with the [father] and in close contact with the members of [the extended families of the father and the mother] would, in fact, outweigh the negative effects that [the] change of custody would have."
*106 "The judgment of a trial court based on ore tenus evidence is presumed correct, and its findings `will not be disturbed on appeal unless they are palpably wrong, manifestly unjust, or without supporting evidence.'" Anderson v. Lee, 621 So.2d 1305, 1307 (Ala. 1993), quoting McCoy v. McCoy, 549 So.2d 53, 57 (Ala.1989). In Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977), this Court stated:
"It is axiomatic that where the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusions on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence."
The record supports the trial court's determination that remaining in Alabama is in the best interest of the child. The testimony of Dr. Roger Rinn, a licensed psychologist in clinical practice in Huntsville, strongly supports the idea that it is important for this boy's father to maintain an important position in his life during his childhood. Dr. Rinn testified that fathers were "very important for sons in particular" and that by being with his father a boy "learns how to be a male, an adult male." Dr. Rinn also testified that boys who have close relationships with their fathers tend to have higher academic achievement, tend to be more empathetic as adults, and tend to be more compassionate toward others. Dr. Rinn concluded his testimony by stating that the more time a male child is able to spend with his father, the more well rounded and better adjusted that child would be. Thus, the trial court heard substantial evidence indicating that the child would benefit by growing up in an area close to where his father lives, so that the important relationship between father and son could be maintained.
The evidence indicated that after the parties were divorced, the mother married a second time, and that her second marriage had also ended in divorce. Testimony given by the father at the modification hearing indicated that the child had been confused during the period just before the mother's second marriage and after that marriage had ended. The father testified that before the mother's second marriage, the son had said to him, "Daddy, ah, I'm getting me a new daddy," and that after the mother's second marriage ended, the child told the father, "Daddy, Kevin [the second husband] has left." This communication highlights the importance of his relationship with his father, with whom he has a strong positive relationship. Dr. Rinn, the father's expert, offered strong testimony suggesting the importance of the child's relationship with his father.
Dr. David Wilson, also a licensed psychologist, testified for the mother. He had had two 40-minute sessions with the child, attempting to assess the child's psychological and emotional state before the date of the custody-modification hearing. He testified that both the mother and the child appeared to be psychologically stable. Dr. Wilson testified that he thought the child was enthusiastic about moving to Michigan, because the child had told him he was "excited about playing in the snow." Dr. Wilson also testified that the mother and the child had a very close relationship and that the child was emotionally dependent on his mother. Dr. Wilson offered no testimony concerning the long-term effects the child might experience by moving away from his father and extended families.
An appellate court may not substitute its judgement for that of the trial court. As the Court of Civil Appeals stated in Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App. 1993), "To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow."
"In domestic relations cases a minor child has an inalienable right to the maximum protection of the judiciary; all other rights are secondary." Ex parte D.W.W., 717 So.2d 793, 796 (Ala.1998). The trial court analyzed testimony given by various experts, counselors, and family members and from that testimony determined that it was in the best interest of the child to stay in Alabama close to his father and to the child's very supportive extended families. We cannot say the trial judge's determination was clearly erroneous or against the great weight of the *107 evidence; its judgment was not plainly and palpably wrong.
The judgment of the Court of Civil Appeals is reversed and the order of the Circuit Court of Marshall County is reinstated.
JUDGMENT OF THE COURT OF CIVIL APPEALS REVERSED; ORDER OF THE CIRCUIT COURT OF MARSHALL COUNTY REINSTATED.
MADDOX, SHORES, HOUSTON, and SEE, JJ., concur.
COOK, J., concurs in result.
KENNEDY and LYONS, JJ., dissent.
LYONS, Justice (dissenting).
I respectfully dissent.
When a noncustodial parent seeks to modify an existing custody determination, that parent bears a heavy burden. He or she must prove that a material change in circumstances has occurred since the last custody order, that a change in custody will materially promote the child's best interests, and that the benefits of the proposed change in custody will more than offset the inherently disruptive effects caused by the change in custody. Ex parte McLendon, 455 So.2d 863 (Ala. 1984); see Ex parte Johnson, 673 So.2d 410 (Ala.1994). In this case, the father had to meet the McLendon burden, and in my opinion, he did not do so.
When the parties were divorced in 1993, they agreed that the mother was to be awarded custody of the child born in 1990, who is now eight years old. The parties also agreed upon certain specified visitation, under the terms of which the child spent approximately 25% of his time with the father. The record reflects that the mother accommodated the father's desire to spend more time with the child than their agreement specified because she knew the father missed the child. The mother also testified that when her job required her to travel, she offered the father the opportunity to have the child stay with him instead of with a babysitter, an opportunity the father accepted. The father testified that under the informal arrangement between the parties, the child has spent approximately 50% of his time with the father and the father's family. Clearly, the mother's encouragement and cooperation have enabled the father and his family to increase the amount of time they have spent with the child. I note, however, that in Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996), this Court stated that "[a]lthough the nature of [such an informal] arrangement and its impact on the child would be factors to be considered in determining whether a transfer of custody ... would materially promote the child's [best interests], the arrangement itself did not constitute a waiver on the mother's part of her right to preference under the divorce judgment." 676 So.2d at 1325.
The mother now wishes to move to Michigan. The record reflects that the father filed his petition for modification shortly after the mother informed him of her proposed move. The mother testified that the reason for her move is that her job at Redstone Arsenal is being phased out and she will be required to move in order to continue her employment with the United States Army. At the time of trial, the mother had worked for the Army at Redstone Arsenal for 15½ years. She said that in addition to allowing her to continue working for the Army, the new job offered to her presented opportunities for greater employment stability and advancement, and she said that the new job would not require her to travel. The mother testified that when she first learned that her current job would be ending, she was informed that the new job "could have ended up in several locations," one of which was the Huntsville area. However, by the time the court held its hearing on the father's modification petition, the mother had learned that the other locations had been ruled out and that she definitely would have to move to Michigan in order to continue with her present employment. As the majority notes, a positive aspect for the mother regarding her proposed move to Michigan is that the man she plans to marry presently lives in Battle Creek.
I see nothing in the record to indicate that the mother's plans to relocate were impulsive or vindictive. On the contrary, the testimony reflected that she had researched the area, had obtained information on schools and after-school *108 care for the child, and had given thought to ways in which the father's visitation schedule could be modified in order to maximize the time the child would be able to spend with him. As the majority notes, the mother also testified that if she has to choose between moving in order to keep her job and quitting her job in order to retain custody of her child, she will quit her job and stay in Alabama.
The trial court's order stated that the mother could retain custody of the child if she stayed in Alabama, but that if she moved to Michigan, the child's custody would be transferred to the father. The trial court stated that the benefits to the child of remaining in close contact with his father and the parties' extended families would outweigh the negative effects the change in custody would have. The Court of Civil Appeals concluded that the father had failed to meet the burden imposed on him by McLendon, and it reversed the trial court's order modifying the custody provisions of the divorce judgment. In reversing the judgment of the Court of Civil Appeals, the majority states that the record supports the trial court's determination that the child's best interests would be served by remaining in Alabama. 727 So.2d at 106. I do not agree. Although in its opinion the Court of Civil Appeals addressed the potential effects on the child caused by the change in custody from his mother to his father, the trial court did not do so and the majority of this Court has not done so in today's opinion. According to McLendon, those effects are a vital consideration.
The psychologist retained by the mother, Dr. David Wilson, had met with the mother and the child on two occasions. He testified that he asked to meet with the father, but that the father declined to be interviewed. Dr. Wilson testified that, in his opinion, the child was more attached to his mother "as far as meeting his actual emotional needs." Dr. Wilson based his opinion, in part, on questions that he asked the child, such as who he would want to take care of him if he were ill and who he would talk to if he really needed to talk to someone about something. In both of those instances, Dr. Wilson stated, the child said he would want his mother. Although Dr. Wilson testified that the anticipated move to Michigan would have some disruptive effect on the child's life, he also testified that the child brought up the subject of the move and that the child said he was excited about the move, even though he said he knew his father would be sad. Dr. Wilson did not say that he thought the child was enthusiastic about moving to Michigan so that he could play in the snow. On the contrary, Dr. Wilson testified that the snow was only one thing the child mentioned. Dr. Wilson also testified that, in his opinion, taking the child away from his mother "would be very difficult and at least possibly traumatic at this point."
On the other hand, the psychologist retained by the father, Dr. Roger Rinn, never met or talked with either of the parents or with the child. His testimony was based entirely on research data and current literature. Dr. Rinn testified that a relationship between a child and his or her father is critically important, especially for a male child, and that the father is the primary role model for boys. In addition to the other testimony noted by the majority, Dr. Rinn testified that "taking the father out of the picture" through a move is a problem; however, when asked about "taking the mother out of the picture," he said that also was a problem. Dr. Rinn also testified that, in his opinion, moving from one place to another was not psychologically disruptive to a child "to any significant extent" and that a move could be an educational and growing experience for a child.
The majority relies heavily on the fact that awarding custody of this child to the father would allow him to remain "close to his father and to the child's very supportive extended families." 727 So.2d 106. Nothing in the record, however, indicates that residing in Michigan would mean that the child would forfeit his relationships with his father and extended families. The record indicated that the mother's family members planned to visit her if she moved and that the mother had thought about and considered ways she could ensure that the child had ample opportunities to visit with his father.
*109 The Court of Civil Appeals has decided several cases in which the facts were very similar to the facts presented in this case. In those cases, the Court of Civil Appeals has held that a change in the custodial parent's residence and the accompanying problems with visitation, without other factors, do not justify a change in custody. See, e.g., Hall v. Hall, 705 So.2d 397 (Ala.Civ.App.1997); Scacca v. Scacca, 694 So.2d 1 (Ala.Civ.App. 1997); Moore v. Moore, 585 So.2d 66 (Ala. Civ.App.1991). As the court noted in Moore, the custodial parent's change in residence is but one factor for a court to consider when ruling on a custody-modification petition. I agree with the Court of Civil Appeals that the custodial parent's change in residence alone is not sufficient to justify a modification of custody. I believe, however, that cases such as these will continue to present problems for both our trial courts and our appellate courts until this Court develops criteria to guide judges in cases in which the noncustodial parent seeks to modify a custody order because of the custodial parent's relocation.
Courts in other states have adopted criteria that I believe would prove helpful in Alabama as well. For example, in D'Onofrio v. D'Onofrio, 144 N.J.Super. 200, 365 A.2d 27, affirmed, 144 N.J.Super. 352, 365 A.2d 716 (App.Div.1976), the New Jersey court held that in relocation cases, in order "to accommodate the compelling interests of all of the family members," a court should consider the following criteria:
"[T]he prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children. It must evaluate the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent, and whether the custodial parent is likely to comply with substitute visitation orders when she is no longer subject to the jurisdiction of the courts of this State. It must likewise take into account the integrity of the noncustodial parent's motives in resisting the removal and consider the extent to which, if at all, the opposition is intended to secure a financial advantage in respect of continuing support obligations. Finally, the court must be satisfied that there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed."
144 N.J.Super. at 206-07, 365 A.2d at 27.[1] The New York Court of Appeals has adopted the following essentially similar criteria to be considered in relocation cases:
"[E]ach parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and [the] child through suitable visitation arrangements."
Tropea v. Tropea, 87 N.Y.2d 727, 740-41, 665 N.E.2d 145, 151, 642 N.Y.S.2d 575, 581 *110 (1996). See, also, Ireland v. Ireland, 246 Conn. 413, 717 A.2d 676 (1998) (adopting the Tropea criteria). The Ireland court recognized the difficult issues that relocation cases present:
"The interests of the custodial parent who wishes to begin a new life in a new location are in conflict with those of the noncustodial parent who may have a strong desire to maintain regular contact with the child. At the heart of the dispute is the child, whose best interests must always be the court's paramount concern."
246 Conn. at 421, 717 A.2d at 680. We have not yet adopted any such criteria, however, so we must review the case before us under our familiar McLendon standard for reviewing custody modifications.
According to the testimony, both parties are good parents and they love and care about their son. The sole reason for the father's petition for modification was the mother's proposed move to Michigan and the inherent difficulties in visitation such a move would create. It follows, however, that changing custody from the mother to the father will create those same difficulties for the mother. In addition, as the Ireland court discussed, "requiring the custodial parent to [forgo] potential benefits of a relocation, such as educational, employment or marriage opportunities, would deny the child the correlative benefits of such opportunities, for example, increased financial or emotional stability of the family unit." 246 Conn. at 431, 717 A.2d at 685. Unfortunately, long-distance relationships have become a reality for many families. Children move away from extended families for any number of reasons. With today's technology, however, communication is possible in many ways, including electronic mail and economical long-distance telephone plans. Transportation options abound as well. These parents have put forth the effort necessary to ensure that their child has a good relationship with both of them. The record reflects no reason to doubt that they could continue to do that if the mother moves to Michigan.
I do not think the father has met the burden imposed on him by McLendon to show that removing this child from his mother's custody would "materially promote" his welfare and best interests. This Court should not put a parent who faces an employment transfer, something that is becoming increasingly common, in the position of having to choose between keeping a good job (and its attendant medical-care and retirement benefits) and retaining custody of a child. I would affirm the judgment of the Court of Civil Appeals.
KENNEDY, J., concurs.
NOTES
[1] The D'Onofrio criteria quoted here have been specifically cited with approval or essentially adopted by many of our sister states. See Pollock v. Pollock, 181 Ariz. 275, 889 P.2d 633 (Ariz.App.1995); Staab v. Hurst, 44 Ark.App. 128, 868 S.W.2d 517 (1994); In re Marriage of Chester, 907 P.2d 726 (Colo.App.1995); Mize v. Mize, 621 So.2d 417 (Fla.1993), superseded by statute as stated in Bartolotta v. Bartolotta, 703 So.2d 1229 (Fla.App.1998); In re Marriage of Eckert, 119 Ill.2d 316, 116 Ill.Dec. 220, 518 N.E.2d 1041 (1988); In re Marriage of Quirk-Edwards, 509 N.W.2d 476 (Iowa 1993); Yannas v. Frondistou-Yannas, 395 Mass. 704, 481 N.E.2d 1153 (1985); Anderson v. Anderson, 170 Mich.App. 305, 427 N.W.2d 627 (1988); Auge v. Auge, 334 N.W.2d 393 (Minn.1983); Effinger v. Effinger, 913 S.W.2d 909 (Mo.App.1996); Trent v. Trent, 111 Nev. 309, 890 P.2d 1309 (1995); Stout v. Stout, 560 N.W.2d 903 (N.D.1997); Gruber v. Gruber, 400 Pa.Super. 174, 583 A.2d 434 (1990); Fortin v. Fortin, 500 N.W.2d 229 (S.D.1993); Taylor v. Taylor, 849 S.W.2d 319 (Tenn.1993); Love v. Love, 851 P.2d 1283 (Wyo.1993). New Jersey has modified the criteria somewhat since 1976. See Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984); Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988).