This case involves a child-custody modification. In 1994, the parties were divorced. The divorce judgment incorporated a settlement agreement reached by the parties, which provided that the mother was awarded physical custody of the child and set a standard schedule of visitation for the father. The agreement further provided:
 "The [father] shall have reasonable opportunity to visit with the child apart from the residence of the [mother], but shall give the [mother] at least 24 hours advance notice of each intended visit. In addition, the [father] shall be responsible for transporting the child to and from the [mother]'s residence and shall bear the expenses thereof, UNLESS THE [MOTHER] SHALL MOVE OUTSIDE THE BORDERS OF ALABAMA, IN WHICH INSTANCE THE COST OF TRANSPORTATION SHALL BE EQUALLY DIVIDED BETWEEN THE PARTIES."
On August 2, 2001, the father petitioned to modify custody. The mother counter-petitioned, seeking to modify the father's child-support obligation and the visitation schedule. The trial court entered the following order:
 "This Matter comes before the Court on the Petition to Modify Custody filed in behalf of the [Father] and the Answer and Counterclaim filed in behalf of the [Mother].
". . . .
 "After hearing the testimony and examining the documents the Court finds that it does have jurisdiction over the parties and the cause of action. The Court further finds that the [mother] has remarried, divorced, is unemployed, and is living in her boyfriend's house and is financially dependent upon him in that he pays for all her needs and necessities. *Page 355 
 "On the other hand, the [father], the grandparents, aunts and uncles live in the area where the child was raised until the [mother] elected to move to the state of Louisiana. The child, when living in Alabama, spent weekly time with the [father] and the grandparents in addition to his regular visitation.
 "The Court is quite concerned about the living arrangements of the [mother] and her inability to care for the child financially.
 "The [father] testified that if the [mother] moved back into the Marbury area he would dismiss his custody petition.
 "The child, upon agreement of the parties and their attorneys, spoke with the Court concerning his desires, and his desires were to be back in the Montgomery area but to live with the [mother].
 "Under these circumstances, it is hereby ordered as follows:
 "1. That the [mother] shall, within thirty days from the date of this Order, move back to the Montgomery area where she has been promised a job.
 "2. The Order as it relates to visitation shall continue in full force and effect.
 "3. In the event the [mother] fails to move back to the Montgomery area within the time frame as specified above, then, upon Motion the Court shall reopen this matter as it relates to custody.
 "4. The Court, having reviewed the Child Support Guidelines at the request of the [mother], finds that under the prior order there was a deviation of the Guidelines at the time of the divorce and the [father] is paying the sum of $400.00 per month in child support for one child. Beginning January 1, 2002, and continuing on the 1st day of each month thereafter, the [father] shall pay child support in amount of $133.00 per month.
 "5. The [father] shall obtain an additional hospitalization card for the [mother] for coverage on the son."
I would treat the mother's appeal as a petition for a writ of mandamus. Unless otherwise provided by law, appeals lie only from final orders or judgments. Fowler v. Merkle, 564 So.2d 960 (Ala.Civ.App. 1989), writ denied, 564 So.2d 962 (Ala. 1990). Here, the mother's continued custody of the child is conditioned upon her moving back to Alabama; if she does not the trial court will reopen the father's modification petition. Therefore, the instant order is not appealable. However, this court may treat such an appeal as a petition for a writ of mandamus.
 "[A] petition for a writ of mandamus is the proper method for seeking to have a trial court vacate an order that it had no power to enter. Great Atlantic Pacific Tea Co. v. Sealy, 374 So.2d 877 (Ala. 1979). A writ of mandamus is an extraordinary remedy, however, that should be granted only if the trial court clearly abused its discretion by acting in an arbitrary or capricious manner. Ex parte Rollins, 495 So.2d 636 (Ala. 1986). The petitioner must demonstrate the following: '(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Adams, 514 So.2d 845, 850 (Ala. 1987)."
Ex parte Edwards, 727 So.2d 792, 794 (Ala. 1998).
In Ex parte McLendon, 455 So.2d 863 (Ala. 1984), the supreme court held that when a noncustodial parent petitions for a custody modification, he or she must prove initially that a material change in circumstances has occurred since the last custody *Page 356 
order, that a change in custody will materially promote the child's welfare and best interests, and that the benefits of the proposed change will clearly outweigh the inherently disruptive effect caused by a change in custody. In the present case, the trial court essentially has not ruled on whether the father has met the burden of proof to modify custody. Instead, it entered a conditional order, leaving the father's petition to modify subject to being reopened at a later date if the mother did not move back to Alabama. Cf. Ex parte Monroe, 727 So.2d 104 (Ala. 1999) (although the mother had not yet moved out of state, supreme court upheld the trial court's order granting the father custody if the mother moved out of state).
Custody awards are final and are generally intended to remain in effect until one of the parties succeeds in a petition requesting the court to modify its custody award. Ex parte J.P., 641 So.2d 276 (Ala. 1994). A change in residence of the custodial parent is but one factor to be considered in determining the outcome of a modification petition, and that factor alone does not necessarily justify a change in custody. Judahv. Gilmore, 804 So.2d 1092 (Ala.Civ.App. 2000).
I note that at the time of the divorce, the parties clearly contemplated that the mother might move out of state. This is in direct contrast to those cases where the parties initially agreed to a territorial restriction and subsequently sought to modify it. Pointer v.Bell, 719 So.2d 222 (Ala.Civ.App. 1998); Cohn v. Cohn, 658 So.2d 479
(Ala.Civ.App. 1994).
A review of the record would not support a change of custody underMcLendon. The father stated that the mother is a good mother and that if she would move back, he would not seek custody of the child.
Furthermore, although a trial court's judgment based on ore tenus proceedings is entitled to a presumption of correctness if it is supported by the evidence, the order in the present case is not supported by the record and, therefore, is not entitled to such a presumption.
The trial court stated in its order that the mother had been promised a job if she returned to Alabama. There is no testimony in the record that the mother has been promised a job in Alabama when she returned. Instead, the mother testified that she had been promised a job in Louisiana before she moved there. However, the job was not available when she arrived in Louisiana. The mother testified that she was employed, before leaving Alabama, but that she lost her job when she was not available for a weekend shift. There was testimony indicating that at the time she lost her job, her former boss would possibly have given her the job back. Instead, the mother decided to move to Louisiana. However, there was no evidence admitted indicating that she had been promised a job upon her return to Montgomery.
The trial court stated that mother's boyfriend provides for "all her needs and necessities." The mother testified that she lives in a home owned by her boyfriend in Louisiana, but that he lives in another home with his parents. She stated that while she has been unemployed, both her boyfriend and her mother have helped her financially.
The trial court was concerned about the mother's ability to support the child and, although she is unemployed, imputed an income of $824 to her, while at the same time, on its own initiative, it reduced the father's child-support obligation from $400 to $133 per month. The record reflects that in 1994 when the parties divorced, the father was employed by an insurance *Page 357 
company making $2,000 per month. The parties had agreed that the father would pay $400 per month in child support, a deviation from the $436 established by the guidelines. The father's CS-41 form for 2001 indicates that he was employed by another insurance company making $993 per month. He testified that he had been in the same line of work for nine years. There was nothing in the record to indicate why the father's income had decreased so substantially while he remained in the same line of work or whether he was voluntarily underemployed. The trial court stated in its order that the child wants to live in the Marbury area, but that the child wants to live with his mother. The trial court interviewed the child alone in chambers and that testimony is as follows:
 "COURT: Hi, young man. First, I'm going to tell you that I am sorry you have to be in the middle of this. . . .
"CHILD: (Nods head.)
 "COURT: The other thing I want you to know is that both your mama and your daddy love you very, very much, you know that?
"CHILD: Hm hmm.
 "COURT: Now, when you lived here and you would visit your dad here, would y'all go hunting?
"CHILD: (Nods head.)
"COURT: And he would take you fishing?
"CHILD: (Nods head.)
"COURT: And y'all would go camping?
"CHILD: (Nods head.)
"COURT: And would y'all ride mountain bikes together?
"CHILD: (Nods head.)
 "COURT: And you did a lot of those things with your daddy and your grandmother and they would go with you when you did those things?
"CHILD: (Nods head.)
 "COURT: And your mama and daddy told me that you play baseball and played All Stars, is that right?
"CHILD: (Nods head.)
 "COURT: Okay. Now, . . . the question come down to this here. You got a lot of relatives that live here. Would you like to move back to Alabama and be with all of your relatives?
 "CHILD: I would like to but I want to live wherever my mama goes.
 "COURT: If your mama moves back up here, you would like to move with her, is that what you're saying?
"CHILD: Yes.
 "COURT: You would like to have everybody pretty close so you could see them all, is that right?
"CHILD: Yes.
"COURT: Cool.
"CHILD: Because I would like to live wherever my mama lives.
 "COURT: Well, I'll tell you this. I will see what I can do about that. I heard you got a deer.
 "CHILD: A seven point. Shot him in the back spine. It knocked one of his bones out of place.
"COURT: What kind of gun did you use?
"CHILD: A 410.
"COURT: You got a deer with a 410?
"CHILD: Yes.
 "COURT: Did you have a (unintelligible) in it? Was it a (unintelligible) shell?
"CHILD: I don't know.
"COURT: Well, it's hard to kill a deer with a 410.
 "CHILD: Right. It's a little hole. Pawpaw was right there with me. He was on the hill. He didn't even hear it. *Page 358 
There's a big old buck. Pawpaw looked down and got my gun and I shot him right there.
 "COURT: Fantastic. I took my boy deer hunting for five years and never saw a buck. I was in a deer stand over one time and heard this shot. It wasn't really quite daylight and I heard another shot.
"CHILD: He killed two four-point bucks.
"COURT: Unbelievable. Okay. Well, . . .
 "CHILD: The time he got that one, though, and all, the other bucks around him, he saw like eight does, one spike and two bucks. He shot the doe and the doe went straight to the ground. All the other deer ran. It was just two bucks and. . . .
 "COURT: Good gracious, Miss Agnes. You are a mighty fine boy. Now, you do good in school for me and don't worry about this. I'm going to take care of it for you."
The trial court did not ask the child about his living arrangements in Louisiana or how he liked living in Louisiana. Clearly, based on the questions asked, the child emphasized that he wanted to live wherever his mother lived. He did not express a desire to live near his father or his family without prompting by the trial court.
The present case is distinguishable from Ex parte Monroe, supra, wherein the trial court awarded the father custody in the event the mother relocated to Michigan. In Monroe, there was evidence that the child spent at least half of his time with his father and there was testimony from experts, counselors, and family members, that the child should stay close to his father and that a "sudden absence of contact with [him] could detrimentally affect him." 727 So.2d at 105.
In the present case, the testimony as to how much time the father actually spent with the child was disputed. There was no testimony from experts or counselors indicating that the child would be detrimentally affected if he continued to live with his mother in Louisiana. The mother has never denied the father visitation and has ensured that the father has had his visitation every other weekend. Additionally, the father testified that the mother should retain custody if she agrees to move back to Montgomery. The mother has demonstrated that she recognizes the importance of the father-child relationship. It appears that the parents could work out a realistic schedule for continued visitation arrangements. Also, the record reflects that although the child would be attending a new school in Louisiana, he would have also been attending a new school in Alabama, and therefore would have incurred change in this area of his life regardless of the move.
In conclusion, the parties contemplated a move by the mother at the time of the divorce. The child would be attending a new school regardless of the move. The child's testimony clearly reflects his preference to live with his mother. No evidence was presented indicating that the child was not being cared for by the mother or that it was in the child's best interests to live in Alabama. Also, I would reverse the trial court's modification of the father's child support award. The mother was unemployed, and the father did not seek a reduction. There was no testimony as to why the father's income had decreased while he had worked in the same profession for nine years. The evidence in the record does not support a change in circumstances so as to warrant a reduction in the amount of child support owed. Therefore, I must dissent. *Page 359