194 N.J. Super. 220 (1984)
476 A.2d 828
DIANA HELENTJARIS (SUDANO), PLAINTIFF-APPELLANT,
v.
JOHN SUDANO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 1984.
Decided May 29, 1984.
*222 Before Judges BOTTER, PRESSLER and O'BRIEN.
Phillip Lewis Paley argued the cause for appellant (Kirsten, Friedman & Cherin, attorneys; Phillip Lewis Paley and Lionel J. Frank on the brief).
Herbert M. Korn argued the cause for respondent.
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff Diana Helentjaris appeals from that provision of a judgment of divorce which conditions her right to continued custody of the child of the marriage upon her return to New Jersey from Ohio, where she is presently practicing medicine, *223 and which requires her to establish her residence within a 40-mile radius of defendant's present residence in Passaic County. We stayed that directive pending appeal, and we now reverse.
The parties were married in August 1980. At that time they were both in their early 30's. Plaintiff was a practicing physician with a specialty in emergency medicine, and defendant had earned a Ph.D. degree in physics and was engaged in corporate employment as an engineer. Plaintiff is a native of Ohio and took up residence in New Jersey upon her marriage, obtaining employment as an emergency care physician at Valley Hospital in Ridgewood. Defendant was born in Italy, his family emigrating to the United States when he was 8 years old. He has been a resident of Passaic County since that time.
Plaintiff learned that she was pregnant in August 1981, approximately one year after the marriage. Defendant, however, denied paternity, claiming that since he kept a record of their sexual activity he could state positively that he was not the father. This circumstance, the troubled history of the brief marriage, and the fact that defendant had struck her after she became pregnant resulted in plaintiff's decision to separate from defendant. This she did in August 1981. She continued to work at Valley Hospital but moved to an apartment in Edgewater, New Jersey, in Bergen County. She had no contact whatsoever with defendant after the first several weeks of the separation. Defendant claims that he did not know where she was living. Her explanation was based on her belief that he lacked interest in her and in the unborn child whose paternity he doubted. It is, however, clear that since defendant knew where plaintiff worked, it would not have been difficult for him to communicate with her. At the least, he could have written to her at her place of employment if he were really concerned about her future or the future of the unborn child.
The child, a boy, was born in February 1982, some 6 to 7 months after the separation. Plaintiff gave the child her own *224 surname of Helentjaris, convinced, as she testified, that raising him would be her exclusive responsibility since the defendant had shown no apparent interest. Following the child's birth, however, the defendant did make claim to paternal rights and obtained an order from the court granting him visitation once each week on 48 hours' notice to plaintiff. He did in fact avail himself of this opportunity to see the child but apparently not on a regular weekly basis. He made no offer of financial support for the child.
In the summer of 1982 when the child was 5 or 6 months old, plaintiff left New Jersey and obtained employment in her medical specialty in the Cincinnati area of which she was a native. While she did not give prior notice to defendant of her precise location, she did provide him with her mother's telephone number and a post office box address to which correspondence could be mailed.
She testified to various reasons for her decision to leave New Jersey. Foremost among them was her desire to arrange a work schedule which would provide her with sufficient income to raise the child while at the same time enabling her to spend maximum time with him. At Valley Hospital she was required to work 12-hour shifts, either from 7 a.m. to 7 p.m. or from 7 p.m. to 7 a.m. The schedule was arduous, and the child was left in the care of an employed caretaker. She attempted to revise her working hours at Valley Hospital but was unsuccessful in doing so. She sought employment at various other New Jersey hospitals and applied to several agencies which place physicians. In July 1982 she was offered employment in the Cincinnati area at an emergency care facility at which she had the opportunity of working only 3 days a week for 11-hour shifts each, leaving her free to spend 4 days a week with the child.
This offer was also attractive to her because it permitted her to pursue her medical specialty, it provided her with virtually the same income of approximately $42,000 a year which she *225 was earning in New Jersey, and it afforded her the opportunity of having the child cared for during her working hours by family members, namely, a sister and a great aunt. The Ohio position was also financially advantageous, she testified, since the cost of living in southwest Ohio is less than that in northeastern New Jersey. As an example, she testified that her automobile insurance premium in Ohio is only half of what it was in New Jersey and that, as a condition of her Ohio employment, she is afforded malpractice insurance. In her New Jersey employment she was required to obtain malpractice insurance at her own expense at an annual cost of approximately $3,000. In addition to these advantages, she testified that most of her close family resided in the Cincinnati area and that she had many friends there on whom she could rely for emotional support and assistance. These circumstances are to be contrasted with her residence in New Jersey to which she came as a stranger upon her marriage, and where she had lived for one year with her husband and for one year as a single parent. Of concern to her as well was her belief that the relatively rural environment of her residence in Ohio was healthier for the child than the urban environment of New Jersey and that the educational opportunities in Ohio were also superior.
During the time between plaintiff's move to Ohio in the summer of 1982 and the commencement of this trial in the summer of 1983, defendant obtained a court order permitting him to visit the child in Ohio. He went twice, once in March with his father and once in May with his mother and sister. On both occasions he chose to drive, although there is regular airplane service between Newark and Cincinnati. The flight is about an hour and a half in duration, and plaintiff's home is 25 minutes by car from the airport.
Although defendant had originally claimed custody of the child, his position at trial was modified to demand only that if plaintiff were to be the custodial parent, an arrangement to which he did not object, she should be required to return with the child to New Jersey so that he could develop and maintain a *226 paternal relationship with the infant. Joint custody was clearly out of the question because of the inability of the parents to cooperate, and the trial judge so recognized. See Beck v. Beck, 86 N.J. 480 (1981). Defendant at trial testified to his absolute belief in his paternity of the child, although he admitted that he did initially believe that he was not the father. Indeed, in support of his application for visitation after the child was born, he had filed a certification stating that his paternity was "a fact which I seriously doubt." This, however, he explained on cross-examination, was a "zinger to Diana." These circumstances notwithstanding, the trial judge concluded that the defendant is now seriously interested in the child.
Prior to trial and at the court's direction, both parties were interviewed by a court-appointed psychiatrist, who concluded that both parents were accomplished and sincere people genuinely interested in the child. In terms of the child's best interests, the psychiatrist was of the view that the child should have available to him both parents and that this could be accomplished by both "living in the same proximity, close enough so the child can benefit from having two parents each of whom has something different to offer the child, and the child should have an opportunity to taste both cultures, backgrounds and personalities." He further testified that it was his
* * * feeling that ideally one should have the mother at home or in today's parlance a parent at home. If this is not possible, and I'm so sure that since it will never be possible that it warrants consideration neither parent in this case is in a position to offer that kind of intense nurturing and development for the first five years of life.
It appears, however, that the psychiatrist did not consider the fact that plaintiff had arranged her work schedule so as to leave her free to be with the child 4 days each week and in the care of close relatives the other 3 days.
In making his factual findings, the trial judge correctly acknowledged his obligation to apply the principles stated in D'Onofrio v. D'Onofrio, 144 N.J. Super. 200 (Ch.Div. 1976), affirmed o.b. 144 N.J. Super. 352 (App.Div. 1976) and Middlekauff v. Middlekauff, 161 N.J. Super. 84 (App.Div. 1978). However, *227 we are persuaded that these principles were incorrectly applied and that the trial judge's findings are not supported by the record.
As was made clear in D'Onofrio, N.J.S.A. 9:2-2 permits removal of the child from the State of New Jersey by the custodial parent on good cause shown. The test of good cause is whether the removal is substantially advantageous under all of the circumstances to the custodial parent and the child and can be accomplished in such a manner as reasonably to preserve the parental relationship between the child and the non-custodial parent. D'Onofrio further indicated that in the judicial appraisal of these factors, it is appropriate for the court to consider, insofar as pertinent to the child's maintaining a parental relationship with the non-custodial parent, the integrity of both the custodial parent's motivations for the removal and the non-custodial parent's motivations for resisting the removal. These good-cause criteria are the same whether the court's approval is sought before or after the move.
Despite what we regard as the overwhelming good cause here shown, the trial judge not only prohibited the removal and required plaintiff to return to New Jersey with the child, but he also imposed upon her the further requirement that she reside within 40 miles of defendant's residence. This further condition was imposed without any suggestion in the record that plaintiff could find both suitable employment and a suitable residence for herself and the child within that circumscription.
In arriving at this disposition by purportedly applying the D'Onofrio principles, the trial judge made findings which the record did not justify. He disparaged the significant professional, social and family advantages which plaintiff gained by her move to Ohio. He made no reference whatsoever to plaintiff's ability to have arranged a 3-day work schedule. Contrary to the evidence, it was his conclusion that plaintiff had not supplied any proof of the claimed economic advantage to her resulting from the move. He also discounted the fact of the *228 proximity of her family in Ohio, noting that "the plaintiff's mother lives in Florida and her brother and other relatives are 60 miles away." He made no reference to the sister and aunt who are caring for the child or her other family members who live in Ohio, including two other brothers. Indeed, when plaintiff was asked on direct examination to enumerate her family members residing in the Cincinnati area, the trial judge sustained an objection to the question on the ground that it was irrelevant.
In respect of plaintiff's reasons for the move, we are constrained to note that the trial judge vigorously and inappropriately cross-examined her in an apparent effort to solicit her admission that a primary consideration was her desire to deprive defendant of his paternal relationship with the child. This she steadfastly denied. Accordingly, the judge's finding respecting the integrity of plaintiff's motives was that while they were sincere, they suffered from a "* * * lack of consideration of the father's feelings." He further concluded that the father's rights were a "factor to be considered in this matter, likelihood of compliance with visitation and realistic opportunity for visitation." While the trial judge did not find that plaintiff would be unlikely to comply with a visitation order, it was his conclusion that visitation by the father in Ohio would be inconvenient to him and "minimal at best."
These findings failed to reflect the proofs fairly and were inadequate to support the trial judge's disposition, which was inconsistent with the case law and the social and family considerations on which the case law is based. There was no rational justification, in the circumstances of this case, for consigning plaintiff for the next decade and a half to the immediate orbit of a man to whom she was briefly and unhappily married, to what is for her an alien environment in which she has neither family nor professional ties, and to what would mean for her the sacrifice of her own professional, social and personal interests. The birth of this child, whose paternity *229 defendant now accepts, is not, under these circumstances, an adequate justification. As was made clear in both D'Onofrio and Middlekauff, each of the formerly married partners has fundamental rights to pursue his or her own destiny. There is, of course, some restraint on that freedom of pursuit which is imposed by the fact that there are children of the failed marriage. But that restraint extends only to the requirement that the life-style decisions of the custodial parent be reasonably consistent with the right of the child and the non-custodial parent to maintain, develop and promote a parental relationship.
In considering the parental relationship between the child and the non-custodial parent, it must be recognized that after a divorce the child of the marriage becomes a member of two separate families, the mother's and the father's. The family unity which is lost as a consequence of the divorce is lost irrevocably, and there is no point in judicial insistence on maintaining a wholly unrealistic simulation of unity. The judicial task is to accommodate all interests without unduly sacrificing any of them. So long as the removal decision of the custodial parent is, as here, based on legitimate and substantial advantages to her, alternatives to physical proximity as a means of securing the child's relationship with the non-custodial parent must be devised. We are satisfied that for these litigants and their child there are viable alternatives.
First, of course, the father could himself relocate to Ohio. It is obviously no more difficult for him to do so than for the mother to return to New Jersey. The court's assumption of the ability to pursue a professional career in another state applies equally to both litigants. Plaintiff is, moreover, no less alien to New Jersey than defendant would be to Ohio, and there is no greater reason for her to give up the comfort of her family and a satisfactory professional situation than it would be for him to do so. If either is to sacrifice in this respect, there is indeed less reason to demand the sacrifice to be made by the custodial parent since it is she in the end who must arrange her life in a *230 manner consistent with the day-to-day burdens of simultaneously raising a child and pursuing a career.
If the father does not choose to move to Ohio, then adequate visitation can be readily arranged, particularly since both parents are in receipt of sufficient income to contribute to transportation expenses. Ohio is not after all the end of the world. A two-hour trip from Newark Airport brings father and child together.
We are further constrained to point out that N.J.S.A. 9:2-2 addresses only the removal of the custodial parent and the child from the state. Nothing in that statute or in its policy underpinnings warranted the trial judge's gratuitous insistence here that the father's New Jersey residence limit the mother's choice of where to live and work in this state, should she have chosen to remain here. If she had found satisfactory professional employment in Cumberland or Cape May County and had moved there with the child instead of to Ohio, the statute would not have required her to change her residence and employment on pain of losing custody of the child. The mother's Cincinnatiarea residence imposes no significantly greater visitation burden than would have resulted from her choice of a southern New Jersey residence.
We are not insensitive to the situation of the non-custodial parent who genuinely desires a relationship with his child. Nor is there any question of the importance to the child of having a firm and healthy relationship with the non-custodial parent. Nevertheless, it is obvious that for the child the fact of the divorce becomes the predicate of his subsequent relationship with both parents and that relationship can never be the same as it would have been had the marriage remained intact. Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go his or her own way. Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context.
*231 The provision of the judgment appealed from is reversed. Pending this appeal we had entered several orders concerning visitation, the last of which was entered on April 5, 1984 after consultation with the parties. That order dealing with visitation shall continue in effect for a period of six months following the date of this opinion. Thereafter, either party on good cause shown may move in the trial court for a modification thereof.