IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2021

**KARA KRULEWICZ v. JOSHUA KRULEWICZ**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2017-CV-557  Kathryn Wall Olita, Judge**
_____

**No. M2021-00190-COA-R3-CV**
_____

The trial court modified the divorced parties' residential parenting schedule, increasing Father's parenting time. Mother appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the of the Circuit Court Affirmed.**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and W. NEAL MCBRAYER, JJ., joined.

James Robert Potter, Clarksville, Tennessee, for the appellant, Kara Krulewicz.

Ryan Kyle McFarland, Clarksville, Tennessee, for the appellee, Joshua Krulewicz.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

Kara Krulewicz ("Mother" or "Appellant") and Joshua Krulewicz ("Father" or "Appellee") were married on August 17, 2006, in Oklahoma. They have two minor children: Preston, born in 2008, and Blake, born in 2012 ("the children"). The parties separated in July 2013 in Virginia, and Mother filed for divorce on March 17, 2017, in the Montgomery County Circuit Court (the "trial court").[1] Mother is a full-time nurse practitioner in the Army stationed in Fort Campbell, Kentucky. She currently lives with her new husband in Cumberland City, Tennessee. Father is enlisted in the Air Force and stationed at Moody Air Force Base in Valdosta, Georgia. He currently lives with his new wife outside of Nashville, Georgia. At the time Mother filed for divorce, she was stationed at Fort Campbell, and Father was stationed in Nevada.

_____
[1] A different trial judge presided over the divorce proceedings than the instant custody proceedings.

The parties entered a Marital Dissolution Agreement ("MDA"), which Father signed on March 7, 2017 and Mother signed on March 14, 2017. The MDA was filed in the trial court on March 17, 2017. An Agreed Permanent Parenting Plan (the "initial parenting plan") was also signed by Father on March 7, 2017 and by Mother on March 14, 2017, and approved by the trial court on April 10, 2017. Father was unrepresented at the time he signed the initial parenting plan and MDA. The initial parenting plan designated Mother as the primary residential parent and provided her 300 days of parenting time per year and Father sixty-five days per year. All major decisions regarding the children were to be made jointly under the initial parenting plan. The trial court held a hearing on the divorce complaint on July 7, 2017. A final decree of divorce was filed in the trial court on August 24, 2017, which incorporated the MDA and initial parenting plan.

On October 24, 2019, Father filed a petition to modify the initial parenting plan, for immediate return of the children, and for a restraining order. Therein, Father alleged, *inter alia*, that the children were being abused by Mother and Mother's then-boyfriend (who later became her husband). The same day, Father also filed a motion for emergency custody, for a restraining order, and for appointment of a guardian ad litem ("GAL"), which essentially mirrored his petition. A hearing on Father's emergency motion occurred in the trial court on November 1, 2019. The trial court determined that Father "had not established a likelihood of immediate harm to the children such that the [initial parenting plan] should be modified prior to a final hearing." However, the trial court ordered, *inter alia*, that corporal punishment was not to be used by anyone against the children and that a GAL would be appointed.

Several other motions and orders were filed in the case. The parties agreed to stay the proceedings when Father was deployed in June 2020, pending his return. A final hearing occurred in the trial court on January 19, 2021.[2] At that time, Preston was twelve years old, and Blake was eight years old. Preston, Mother, Father's sister, Mother's husband, and Father testified. Father testified that from the time he signed the initial parenting plan until he deployed to Turkey in August 2018, he did not exercise his visitation time under the initial parenting plan, in part because he could not afford round-trip plane tickets from Nevada to visit the children.[3] He was deployed in Turkey until August 2019, during which time he had one week of leave, almost all of which he spent with the children. From the summer of 2017 until August of 2019, Father testified that he spoke to the children any time that his sister, mother, or father had them, but that the eight-hour time difference and his work schedule made it very difficult to coordinate calls when he was in Turkey. However, he also acknowledged that he had "dropped the ball" by not seeking to call the children directly through Mother during that time, and was now trying to improve by reaching out to them through Mother, which he generally tries to do twice per week. He

---

[2] The hearing occurred via Zoom, presumably due to COVID-19.
[3] Mother testified that Father exercised visitation during spring break in March 2018, which she reiterates in her brief. It is unclear if she meant to say March 2019 instead.

volunteered that Mother is "actually pretty good about having [the children] call [him]."

Upon returning from deployment in Turkey, Father stated that he did not have fall break visitation in 2019 because it occurred when he was in the process of moving to Georgia and therefore living in a hotel. However, he exercised visitation with the children for Thanksgiving and Christmas of 2019, switching some visitation time with Mother because she had decided to plan a trip to Disney for the children during his allotted time. According to Father, his next deployment was between June 12, 2020 and October 8, 2020, so he attempted to work with Mother to move his summer 2020 visitation up before he left. However, he testified that Mother would not agree to that, so he only got a short amount of time with the children during that summer (approximately two weeks instead of the allotted four). Father testified that during this deployment, he was in Saudi Arabia and did not have access to a phone system, so he was unable to phone anyone. When he returned from Saudi Arabia, he stated that he saw the children with his new wife during a visit in November 2020, during which time he asked Mother if the children could stay with him an extra night, which she did not allow. He also testified to spending the first week of Christmas 2020 with the children.

Regarding the abuse allegations, Father testified that when he first learned of them from his mother, he could not leave his deployment in Turkey because he was in a position he could not be released from (and that due to national security reasons, he could not discuss what that position was). He also testified that while he was in Turkey, he attempted to call "child services, and [] was working with them up until the point" he decided to file his emergency petition and motion around August 2019, which is when he started seeking counsel.

Each party testified that they gradually introduced their new spouses to the children (though Wife alleged that Father did the opposite). Father and his wife own a two-bathroom, three-bedroom house on four acres of land, where Preston and Blake each have their own rooms. He testified that he had requested to be stationed at Shaw Air Force Base as his first preference, which was the option closest to the children, and that Moody was the second-closest. He also stated that other Air Force bases would have afforded him better career opportunities than Moody, but he turned those down to be closer to the children.

Father testified that his wife has a good relationship with the children, they spend a lot of time together, and Blake loves her. Father further testified that while Preston "gets snappy with her a couple times," she is always nice to him. He explained that Blake is always in good spirits when they are together, and that Preston is a typical twelve year-old boy who "would rather spend his time with friends and play video games" than do things like going fishing, which Father said he has asked Preston to do several times. When asked if Preston shows a reluctance to bond with Father, Father said that Preston is "kind of standoffish" but he warms up the longer he is around Father. Father explained that since he just returned from a deployment, he would not be subject to another one "for a long

time." Further, he said, *inter alia*, that he planned to retire from the military in three years, while stationed at Moody, and there is no chance that he will be relocated again.

Preston testified that he calls his Mother's husband "Dad," of his own volition, and refers to Father as his "other dad." He stated his belief that Father and Father's wife do not want to spend time with him and that Father's mother is trying to take him away from Mother. He also testified that Father's mother has said negative things about Mother and her new husband to the children. When asked if Mother told Preston that Father is pursuing this case because Father's mother is trying to take the children from Mother, Preston answered, "No, not really. She sometimes did . . . ." Otherwise, he denied that anyone told him what to say at the hearing or planted ideas in his head, instead repeatedly attributing his impressions to "common sense."

Preston further testified that Mother and her husband used to spank him and Blake but no longer do, which Mother confirmed. Preston stated that Mother's husband cooks for him, asks him to help with household chores, has taught him how to shoot guns and about gun safety, and used to take him and Blake to activities before they ended due to COVID. He said that he and Blake share a room at Mother and her husband's house, but it is the biggest room in the house. He also said that he does not get along with Father's wife even though she is friendly to him and Blake. He indicated that when he is at Father's house, he mainly spends time with his friends who live next door. When the trial judge asked Preston if he knew that Father was recently deployed for over one year, Preston answered, "no." When asked if he would change the parenting schedule, Preston expressed his desire to spend more of winter break with Mother in exchange for more time with Father in the summer. Preston expressed, *inter alia*, that he would like to continue residing primarily with Mother, but he "guess[ed]" it would be okay to spend more time with Father and Father's wife.

Mother and her husband have one child together, born in 2018 ("the baby"), and were expecting another at the time of the hearing. Her husband has four daughters from a previous marriage, two of whom are minors and live part-time with Mother and her husband. One of his adult daughters lives with them when she is home from college. Mother asserted that she and her husband try to encourage the children to have a relationship with Father, and that her husband loves the children and has a positive, involved relationship with them, including supervising them when they are home doing remote-learning. Mother explained that before she and her husband were married, but after the baby was born, (around February 2019), they got into an argument that resulted in her filing an order of protection on the advice of her friend, which she later dropped. However, she asserted that the argument did not involve a physical altercation and she was not afraid of her now-husband.

The children are in therapy, and evidence was introduced of a text message exchange wherein Father repeatedly sought information regarding their counseling

sessions from Mother, until finally the parties' attorneys had to get involved. Mother asserted that Father had already been in possession of some of the information he requested, and that she had provided him enough other information for him to find what he was asking for. When pressed by the trial judge as to why she had not simply responded to Father's requests with information she had or could easily obtain, Mother acknowledged that she had "with[eld] a little bit." Mother also testified that she started Blake on Ritalin without consulting Father, only informing him after the fact. She also did not inform Father when Blake developed abnormal behaviors such as hitting himself and pulling his hair. She testified that Blake and Preston's therapists have diagnosed them with adjustment disorder with anxiety since the beginning of the custody issues, and that Blake has a cognitive processing disorder, which he was diagnosed with in preschool. She said that she informed Father of the children's adjustment disorder diagnoses, which Father disputed. She asserted that Father has acted selfishly in the manner in which he has attempted to reconnect with the children, which has been disruptive to the children's lives. She also explained, *inter alia*, that she cut Father's mother off from the children after Father's mother "crossed several boundaries," and that she believes that Father's mother is behind the custody battle. Nevertheless, she stated that she would be willing to cooperate and facilitate Father taking a more active role in raising the children, despite her reservations concerning his absence. She also admitted that it would be good for the children to have positive, healthy relationships with her and Father and both of their stepparents, which she is willing to try to encourage.

Father's sister testified that Preston lived with her in Alabama from approximately 2014 to 2017, pursuant to Mother and Father's agreement, because Mother had to move around for her schooling. According to Mother, she visited Preston at least monthly during that time. According to Father, for at least six months during that time, he and Blake lived with his mother, just down the street from his sister and Preston, and he had daily contact with the children. Father's sister also testified that when Mother filed the order of protection against her now-husband, she came to Alabama with the children and the baby to stay for a week with Father's parents. Regarding the altercation that precipitated the restraining order, Father's sister testified that Mother told her, *inter alia*, that Mother's husband "had hurt [Mother] in the presence of the [children] and the baby." Father's sister explained that she has generally not witnessed acts of violence or abuse by Mother's husband, but that one time she witnessed him "bowing up" at Preston after Preston had bumped into the baby's car seat. However, she said that Mother's husband did not "put his hands on" Preston during that incident. She also testified, *inter alia*, that she "pray[s] every night that [Mother's husband] doesn't kill [Mother] and th[e children]" because she "think[s] he's scary" and "dangerous," primarily based on her conversations with Mother.

Mother's husband testified that he is retired from the military and works as an independent contractor, taking occasional jobs facilitating military trainings. He said that he has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), for which it is unclear if he has received treatment, and takes prescription medications for certain medical

conditions, including tremors and chronic pain due to injuries from his military service. He answered affirmatively when asked if he and Mother stopped spanking the children "after Preston said something to his counselor at school and DCS came . . . out to [their] house." He acknowledged that he may have on occasion told the children that he would "beat [their] butt." He also explained that in 2017, he was charged with aggravated assault,[4] but the charge was ultimately dismissed and he has no criminal record. He said that he and Mother participated in marriage counseling to work through their issues. He further testified, *inter alia*, that he helps Blake and Preston with their schooling, working extensively with Blake.

The trial court filed a Memorandum Opinion and Order on January 29, 2021, contemporaneously with a permanent parenting plan revising the initial parenting plan. Therein, the court found that there had been a material change in circumstances warranting modification of the residential parenting schedule in the initial parenting plan, but not a modification of the designation of Mother as primary residential parent. The trial court also found that revising the schedule was in the children's best interests. The trial court increased Father's parenting time to 120 days per year and decreased Mother's to 245 days. The trial court then filed an amended permanent parenting plan on February 4, 2021.

On February 9, 2021, Mother filed a motion to alter or amend under Rule 59.04 of the Tennessee Rules of Civil Procedure. In an order filed on February 26, 2021, the trial court granted in part and denied in part Mother's motion to alter or amend, ordering, *inter alia*, that Father's parenting time be increased to 130 days per year, therefore concomitantly decreasing Mother's time to 235 days. The trial court entered a second amended permanent parenting plan on February 26, 2021 ("the revised plan"), which reflected the court's rulings in the order on the motion to alter or amend. The revised plan, *inter alia*, awarded Father one long weekend per month during the school year falling in any month when he does not already have parenting time, along with "the option of exercising another weekend in the month in the state where Mother resides with fourteen [] days' notice to [] Mother of h[is] intent to do so." The revised plan also divided holidays and school breaks between Mother and Father and permitted the children to fly as accompanied minors to cut down on driving time between visits. Mother appealed.

### ISSUES PRESENTED

As we perceive it, the parties both raise the following issues:

1. Whether the trial court erred in finding a material change of circumstances that justified a modification of the permanent parenting plan.

2. Whether the trial court erred in modifying the residential parenting schedule based

---

[4] This alleged assault did not involve any children, Mother, or any other domestic or romantic partner.

on its analysis of the best interest factors.[5]

## STANDARD OF REVIEW

Our supreme court "has previously emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." ***C.W.H. v. L.A.S.***, 538 S.W.3d 488, 495 (Tenn. 2017) (citing ***Armbrister v. Armbrister***, 414 S.W.3d 685, 692–93 (Tenn. 2013)). "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." ***Armbrister***, 414 S.W.3d at 692–93 (citation omitted). Therefore, pursuant to Rule 13 of the Tennessee Rules of Appellate Procedure, "appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." ***Id.*** at 693 (citations omitted). "Indeed, trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans." ***C.W.H.***, 538 S.W.3d at 495 (citations omitted). "On appeal, we review a trial court's decision regarding parenting schedules for an abuse of discretion." ***Id.*** (citations omitted). "A trial court abuses its discretion in establishing a residential parenting schedule 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" ***Armbrister***, 414 S.W.3d at 693 (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001)).

## DISCUSSION

While modification of the custody decree naming Mother the primary residential parent was at issue at the trial level, Father does not appeal the trial court's decision not to modify the primary residential parent designation. Therefore, we will only address the trial court's modification of the residential parenting schedule. Tennessee Code Annotated section 36-6-101(a)(2)(C) controls when "the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule." In that case,

> the petitioner must prove by a preponderance of the evidence a material
> change of circumstance affecting the child's best interest. A material change
> of circumstance does not require a showing of a substantial risk of harm to
> the child. A material change of circumstance for purposes of modification of
> a residential parenting schedule may include, but is not limited to, significant

---

[5] Mother phrases her second issue as follows: "Did the trial court abuse its discretion in fashioning its modified permanent parenting plan[?]" Upon our review, however, it appears that her argument generally focuses on the trial court's findings as to the children's best interests. Our consideration of Mother's second issue therefore maintains this same focus.

changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C). "This statute contemplates a two-step analysis, predicated upon a finding that there has been a material change of circumstance . . . . 'since the plan took effect.'" *Hartmann v. Hartmann*, No. M2018-00891-COA-R3-CV, 2019 WL 4187500, at *2 (Tenn. Ct. App. Sept. 4, 2019) (citations omitted). "If the trial court finds that there has been a material change in circumstances, only then must it determine whether it is in the child's best interest to modify the parenting plan[.]" *Id.* (citing *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007)).

## A. Material Change in Circumstances

There is "a very low threshold for establishing a material change of circumstances when a party seeks to modify a residential parenting schedule." *Armbrister*, 414 S.W.3d at 703 (citations and internal quotation marks omitted). In contrast, there is a higher "threshold for determining whether there has been a material change of circumstances necessary to modify . . . custody (or designation of primary residential parent) under section 101(a)(2)(B)." *Hartmann*, 2019 WL 4187500, at *2 n.2.[6] Additionally, "a party requesting modification of a residential parenting schedule" is not required "to prove that the alleged material change in circumstances could not reasonably have been anticipated when the initial residential parenting schedule was established." *Id.* at 704.

Keeping these principles in mind, we turn to consider the trial court's findings regarding a material change in circumstances:

[T]he Court agrees with Father that there
has been a change that warrants modification, but not one that rises to the level of changing custody. When the 2017 Plan was entered, Preston was living with [Father's sister] in Alabama, Mother was with Blake in Clarksville and Father was stationed in Nevada. Mother has since reclaimed physical custody of Preston and Father has relocated to Alabama.[7] Both parties have remarried. In short, both parties have settled into more stable situations such that a revised parenting schedule is both necessary and feasible. While the Court does not find that the facts of this case meet the

---

[6] Mother's reliance on this higher standard in her appellate brief is therefore in error.

[7] This appears to be a typographical error, as the parties do not dispute that Father has relocated to Georgia, not Alabama.

standard to change custody from Mother to Father, they do support a change of the parenting schedule.

The evidence in the record does not preponderate against the trial court's findings that a material change in circumstance has occurred. Since entry of the initial parenting plan in the trial court on April 10, 2017, the following changes have occurred: Father relocated from Nevada to Georgia so that he could be closer to the children, with no imminent deployments anticipated; Mother remarried and had another child with her husband; Preston stopped living with Father's sister in Alabama and began living with Mother in Tennessee; Father remarried; and Father exercised visitation under the initial parenting plan more consistently after he returned from deployment in August of 2019.

Many of these changes certainly qualify as "significant changes in [Father's] living or working condition that significantly affect parenting." Tenn. Code Ann. § 36-6-101(a)(2)(C). Namely, the fact that Father lives closer to the children now, deliberately having requested to be stationed as close as possible to them, and does not anticipate being deployed in the near future, significantly increases the feasibility of consistent visitation with the children. Father has also demonstrated initiative in making greater efforts to exercise his visitation since he returned from deployment in 2019, which is a change evidencing his desire and intent to be involved in the children's lives. Additionally, "[a]lthough remarriage is not, in every instance, a material change in circumstances, Tennessee courts have long held that the possible change in home environment caused by such remarriage is a factor to be considered in determining whether or not there has been a material change in circumstance." *Armbrister*, 414 S.W.3d at 705 (quotation marks and citations omitted). Father's wife appears to have a good bond with Blake, and though she does not have the same relationship with Preston, there is no indication that she treats Preston poorly. Rather, she and Father appear to have a functional relationship and a stable home, with plenty of room for the children to feel welcomed.

Mother argues that the trial court did not address Father's failure to adhere to the initial parenting plan "at all," other than considering his deployments. Respectfully, we disagree. The trial court may not have explicitly addressed Father's past lack of visitation in its above findings on a material change of circumstances. Nevertheless, the preceding factual findings in the trial court's order, which we need not tax the length of this Opinion by reciting here, address in detail the history of this case, including Father's improvements in exercising his allotted visitation in the time since the initial parenting plan was entered. Thus, the trial court clearly took that into account in deciding whether a material change in circumstances had occurred.

Additionally, Mother argues that the initial parenting plan clearly contemplated that the children were, or would be, living in Clarksville with Mother . . . and that she would exercise 300 days per year of parenting time. It is error for the [t]rial [c]ourt to conclude that execution of the agreed

- 9 -

plan . . . was somehow a change of circumstances. It was merely execution of what had already been agreed to.

Mother's argument is somewhat difficult to discern. To the best of our ability, we understand it to be two-fold. First, Mother appears to aver that the trial court improperly considered circumstances that existed before the final divorce decree was entered (i.e., Preston living with Father's sister) when determining whether a material change in circumstances occurred. As an alternative, Mother appears to argue that to the extent that the children's living circumstances did change after the trial court first approved the initial parenting plan in April 2017, those changes were anticipated when the plan was executed and thus cannot be properly considered. Regarding the latter, as we have explained, the law does not require that changed circumstances must have been unanticipated in order to constitute a material change in circumstances. *See Armbrister*, 414 S.W.3d at 704. As to the former, to the extent that Mother is attempting to make an argument regarding res judicata, she does not articulate it sufficiently for us to properly evaluate it. *See Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Finally, even if, *arguendo*, this particular change should not have been considered, other changes were sufficient to support the trial court's determination that a material change in circumstances affecting the children's best interests occurred following the relevant time, which warrant modification of the residential parenting schedule, as explained above. *See Hill v. Lamberth*, 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001) ("[T]his Court may affirm the trial court's decision when rendered on different grounds."). Thus, the evidence does not preponderate against the trial court's finding that Father met his burden of proving a material change in circumstances. *See Armbrister*, 414 S.W.3d at 705.

## B. Best Interest

Section 36-6-106(a) governs the best interest analysis. It directs courts to consider the following factors when assessing a child's best interest in the context of custody determinations:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness

- 10 -

of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

"The best interest determination is a fact-sensitive inquiry" that "does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Drucker v. Daley*, No. M2019-01264-COA-R3-JV, 2020 WL 6946621, at *12 (Tenn. Ct. App. Nov. 25, 2020) (internal quotation marks and citation omitted). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (internal quotation marks and citation omitted).

In addition to arguing that the trial court focused on Father's best interests and not the children's in modifying the parenting schedule, Mother takes issue with the trial court's findings on some of the best interest factors in section 36-6-106(a). The trial court explicitly found that factors one and ten favor Mother, factors two, four, five, six, and nine are equal between Mother and Father, and factor three is inapplicable. The trial court further appears to have found that factors seven, eight, eleven, twelve, thirteen, and fourteen favor neither party.[8] So as not to tax the length of this Opinion, we will analyze only those factors that Mother disputes.

With regard to the first factor, the trial court found as follows:

Both parties love these children. For the last several years, Mother has been responsible for the majority of the parenting responsibilities relating to the daily needs of the children. Prior to that, however, neither Mother nor Father performed the daily parenting of Preston — [Father's sister] did that. Father has had two deployments since the entry of the 2017 Plan and the Court does not consider those periods for the purposes of analyzing this section. Since returning from Turkey, Father has endeavored to exercise the minimal time he is allotted and to get more information about the boys. Mother was resistant to sharing information unnecessarily. While this factor favors Mother based on more recent events, both parents are able and capable of providing for the children's daily needs.

---

[8] As to these factors, the trial court did not make an explicit finding as to which parent the factor favored. Mother infers from this lack of specific findings that some of these factors were deemed equal by the trial court. We will proceed as if these six remaining factors were found to favor neither party, but encourage trial courts to be precise in making best interest findings whenever possible.

*See* Tenn. Code Ann. § 36-6-106(a)(1) (involving the strength of the parents' relationship with the children and which parent has performed most of the parenting duties). Mother argues that the trial court's assessment of this factor as "more or less equal" is a "clearly [] erroneous assessment of the evidence," and that "the strength and nature of Father's relationship with the children could not be more lacking due to his absence." The evidence does not preponderate against the trial court's findings. First, despite Mother's argument otherwise, nothing in the trial court's order indicates that it found this factor to be equal; instead, the trial court found that this factor favors Mother but included a caveat that Father is capable of also performing these responsibilities. Next, the trial court was aware of Father's absences in the past and the reasons he provided for them, including being unable to afford flights to visit the children initially and his later military deployments. The trial court was also aware of Father's improvements in exercising his visitation since the initial parenting plan was entered, the nature of his relationships with the children, including an apparently positive one with Blake, and his desire to spend more time with them. The evidence also demonstrates that Mother has been performing the majority of the parenting responsibilities in recent years. Therefore, we cannot conclude that the trial court erred in finding that this factor favors Mother but that Father is capable of performing parenting responsibilities.

> As to the second factor, the trial court found that
> Both parents are capable of performing the requisite parenting responsibilities. The Court does not believe that Mother has expressed a sincere willingness or ability to facilitate and encourage a close and continuing parent-child relationship between the children (especially Preston) and Father, consistent with the best interest of the children. While there is no history of denying visitation or violating prior court orders, Mother's failure to communicate was unnecessarily difficult and evasive.
> While the allegations of abuse have certainly caused there to be distrust between these parties, there is no evidence to suggest ill-will on Father's part in looking out for the children's best interests. This factor is equal as to both parties.

*See* Tenn. Code Ann. § 36-6-106(a)(2) (involving the parents' past and potential for future performance of parenting duties and their willingness to encourage the children's relationships with each parent). Mother argues that the trial court did not address Father's past failures to exercise visitation, besides giving him consideration for his absences during deployments. Mother also asserts that the trial court gave Father the benefit of the doubt as to whether he would comply with the revised plan, despite evidence of his past disinterest. As examples of such disinterest, Mother cites Father not exercising even one-half of the time he was allowed under the initial parenting plan before filing his petition to modify, waiting months after learning of the alleged abuse of the children to file his emergency

- 13 -

petition, and not knowing how many parenting days he was entitled to under the initial parenting plan.[9]

We agree with Mother that in the past Father did not meet all of his responsibilities. But, again, the trial court heard evidence regarding why Father had not previously exercised all of his allotted visitation, how he has improved in his efforts to exercise visitation, and why he had waited to file his emergency petition, including being limited by his deployment in Turkey. The trial court's findings appear to implicitly credit Father's explanations for his past failures. We accord great deference to the trial court's witness credibility determinations. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)) ("[A]ppellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'"); *see also Lowe v. Smith*, No. M2015-02472-COA-R3-CV, 2016 WL 5210874, at *5 (Tenn. Ct. App. Sept. 19, 2016) (citing *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008)) ("[T]he trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal."). To the extent that the trial court gave Father the benefit of the doubt as to whether he will comply with his parenting duties, then, the evidence does not preponderate against that decision. Moreover, the evidence supports the trial court's findings that Mother has not necessarily demonstrated a sincere willingness and ability to facilitate a close relationship between Father and the children. For example, she admittedly withheld information from Father regarding the children's care and was unwilling to make changes in order for Father to see the children for his full allotted time before a deployment outside of his control. Therefore, we conclude that the trial court did not err in finding this factor to be equal.

Regarding factor four, the trial court found that "[b]oth parents are able to provide the children with food and other necessary care. This factor is equal as to both parties." *See* Tenn. Code Ann. § 36-6-106(a)(4) (regarding each parent's disposition to provide the children with necessities). Mother's only assertion on this factor is that the trial court "found this factor equal, although it did not address Blake's cognitive processing disorder within the context of Father's visitation." She cites to no evidence that Father is unable to provide Blake with necessary care regarding his cognitive processing disorder or that Father's visitation will somehow interfere with Blake's needs in that regard, nor can we find any in our review of the record. *See Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010) (citing Tenn. R. App. P. 27) ("Parties are required to provide citation and support identifying where in the record evidence can be found."). Therefore, the evidence does not preponderate against the trial court's finding that this factor is equal.

---

[9] As to the third example, Mother relies on the fact that Father testified that he thought he had sixty days, not sixty-five, under the initial parenting plan.

The trial court found as to factor five as follows:

As set forth above, for the last several years, Mother has been responsible for the majority of the parenting responsibilities relating to the daily needs of the children. At the current time, Mother works during the week and [her husband] provides the majority of the care for the boys. Prior to that, however, neither Mother nor Father performed the daily parenting of Preston — [Father's sister] did that. This factor is equal as to both parties.

*See* Tenn. Code Ann. § 36-6-106(a)(5) (involving which parent has been the primary caregiver). Mother's argument as to this factor is, *in toto*, as follows: "Proof was that both children had lived with Mother virtually the entire time since the divorce. It was error for the [trial c]ourt to consider events and situations existing prior to the divorce as it did in its discourse on this section." Other than citing to the trial court's order, Mother fails to expand on this argument in any manner, nor does she support her contention with citation to any legal authority. Therefore, any argument to this effect is waived. *See* **Sneed**, 301 S.W.3d at 615; **Bean v. Bean**, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) (citations omitted) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) [of the Tennessee Rules of Appellate Procedure] constitutes a waiver of the issue.").

Regarding factor nine, the trial court found as follows:

The boys have one half-sibling, a baby sister, at Mother's house. There is also another baby on the way. They also have four step-sisters ([Mother's husband's] daughters). They appear to have a happy and loving blended family. Father is remarried to [his wife], and the Court did not hear any evidence to suggest that she is not a fit or appropriate person to be spending time with the boys. To the contrary, Father testified that [his wife] cares for the boys very much and enjoys spending time with them. She has been teaching Blake how to speak Dutch and enjoys cooking with and for the family. This factor is equal as to both parties.

*See* Tenn. Code Ann. § 36-6-106(a)(9) (involving the children's activities and interpersonal relationships). Mother argues, however, that the trial court "failed to address the children's involvement with school, scouting, sports activities and church. This is evidenced by the disruptive effect the monthly visitations will have on their lives, making participation in typical childhood activities difficult if not impossible."

On the one hand, we agree with Mother that factor nine requires the trial court to consider proof concerning the children's school and significant activities. *See* **id.** But Mother's brief on this factor fails to point to any proof presented on these issues. "'[J]udges are not like pigs, hunting for truffles buried in' the record." **Flowers**, 314 S.W.3d at 899

- 15 -

(quoting *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002)). Here, Mother's brief fails to point to even a single instance where testimony indicated that the children's activities would be disrupted by the parenting schedule. Indeed, there was scarce evidence presented as to the boys' current extracurricular activity schedules while in Mother's care.

We do note, however, that courts are "not required to check [their] common sense at the door . . . ." *Eberting v. Eberting*, No. E2010-02471-COA-R3-CV, 2012 WL 605512, at \*20 (Tenn. Ct. App. Feb. 27, 2012). As a result, it is foreseeable that semi-monthly weekend visitation may interfere with some activities that the boys could participate in while in Mother's care. While courts should make every effort to fashion parenting plans that minimize disruption, unfortunately some disruption in children's lives is inevitable in divorce. As the Tennessee Supreme Court has recognized,

> [I]t is obvious that for the child the fact of the divorce becomes the predicate of his subsequent relationship with both parents and that relationship can never be the same as it would have been had the marriage remained intact. Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go his or her own way. Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context.

*Taylor v. Taylor*, 849 S.W.2d 319, 330 (Tenn. 1993) (quoting *Helentjaris v. Sudano*, 194 N.J. Super. 220, 230, 476 A.2d 828, 833 (App. Div. 1984)). Indeed, Tennessee's public policy places great importance on maximizing the time that a non-custodial parent has with his or her child, so long as that arrangement is in the child's best interest. *See* Tenn. Code Ann. § 36-6-106(a) ("In taking into account the child's best interest, the court shall order a custody arrangement that permits *both parents to enjoy the maximum participation possible* in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.") (emphasis added); *cf. Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 649 (Tenn. Ct. App. 2017) (describing "Tennessee statutory law" as "the most salient source of Tennessee public policy").

Here, it may be true that the children's activities will be disrupted by the schedule imposed by the trial court. Unfortunately, this is a natural consequence of the divorce and the parties' obligations, which require that they live in different locations. This distance does not appear to be the fault of any party. In order for Father to have an opportunity to parent his children on more than a periodic basis, some disruption is unfortunately inevitable. But Mother's failure to cite to authority or proof on this issue means that she has failed to show that this inevitable disruption is enough to overturn the trial court's finding that this factor was equal.

On factor thirteen, the trial court ruled as follows:

In Tennessee, a child who is age 12 or older can testify following a request by one of the parents. In that instance, the child's wishes can be considered by the court. Courts generally do not look favorably upon a child being manipulated, coerced, or coached by a parent.

Based upon his age (12), maturity, and the agreement of the parties, the Court finds it appropriate to consider Preston's preference. It is the preference of the child to continue living with Mother and spend little time with Father. Preston was extraordinarily prepared to give his testimony in this matter. He was armed with a list of reasons why he should only have limited visitation at his Father's; primarily, his belief that his Father doesn't want to spend time with him. It is certainly unfortunate that Preston holds that opinion. To the contrary, the Court finds that Father does want to spend time with Preston and 65 days is simply not enough time for it to be meaningful. Preston used much of the same verbiage about the abuse allegations as the adults used. Specifically, he described his [Father's Mother] as having "over-exaggerated" about the alleged abuse incident. He testified that prior to the trial, he did visit with Mother's counsel and then [Mother's husband] took him to buy new clothes and Legos and also hot wheels for Blake. While he assured the Court that he was only told to tell the truth, he also reported that "[Father's mother] is using them (Father and [his wife]) to get more time with us." He also shared, "[t]hey don't really want the time." It is clear to the Court that Preston has either heard or been a part of much discussion about this situation. General discussion is not inappropriate. While he is certainly very bright and articulate, he is also 12 and it is unlikely that he would have formed those specific opinions about his Father and grandparents without input and influence from Mother. Given that [Father's sister] and Father's parents raised Preston for the better part of three (3) years, the Court finds it hard to believe he would have formed such negative beliefs on his own. Ultimately, his preference to only spend little time with his Father is not reasonable and this Court is only required to consider a child's *reasonable* preference.

*See* Tenn. Code Ann. § 36-6-106(a)(13) (regarding the reasonable preference of the child if twelve years of age or older).

Mother argues that the trial court failed to account for Preston's testimony about Father's lack of interest in him, and that Preston's conclusion that Father does not want to spend time with him is logical, considering Father's prior absence. Mother also argues that the trial court "failed to articulate how Father's stated desire to spend more time with his son (Father's past history notwithstanding) serves Preston's best interest." Finally, Mother

- 17 -

avers that the trial court's "opinion regarding the number '65 days' lacks an evidentiary foundation and is therefore, error." Again, the evidence does not preponderate against the trial court's findings.

The trial court was well aware of Preston's feelings toward his Father and explicitly addressed them in its findings on this factor. Preston's preference, while entitled to consideration, "is only one of many factors to be given consideration" and "is not controlling on the court." *Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *8 (Tenn. Ct. App. Oct. 27, 2015) (citing *Scoggins v. Scoggins*, No. M2007-02148-COA-R3-CV, 2008 WL 2648966, at *6 (Tenn. Ct. App. July 2, 2008)) (in the context of modification of the primary residential parent). Moreover, the trial court was entitled to find Preston's preference unreasonable. For example, in *McClain v. McClain*, 539 S.W.3d 170 (Tenn. Ct. App. 2017), we held, in the context of modification of a primary residential parent designation, that the trial court did not fail to consider the child's preference by adopting a parenting plan at odds with the child's wishes. *Id.* at 207. Instead, we held that "[r]ather than failing to consider the [c]hildren's preference, the trial court's findings demonstrate that it listened closely to [the children's] respective testimonies but found that their stated preference was not 'reasonable[.]'" *Id.*

The trial court's finding that Preston's preference was not reasonable or dispositive is supported by facts in the record. For one, Preston's testimony that he was unaware of Father's recent lengthy deployment calls into question whether there is, in fact, an entirely rational basis for Preston's conclusion that Father does not want to spend time with him. Mother herself testified that it would be good for the children to have a relationship with Father, so it is difficult to understand how she can now claim that Father's stated desire to spend more time with Preston does not serve Preston's best interest. While the trial court was presented with no expert proof that sixty-five days was insufficient to establish a meaningful relationship, the trial court is permitted to exercise common sense and its judgment in parenting determinations. *Cf. Armbrister*, 414 S.W.3d at 706 ("[T]he specific modifications a trial court adopts to address a material change in circumstances and to serve the best interests of children are the kinds of details an appellate court should not "tweak" absent an abuse of discretion."). Here, much of Preston's animosity towards Father appears to stem from his belief that Father does not want to spend time with him. Giving Father an opportunity to spend more time with Preston may have the effect of improving their relationship. It therefore appears that reasonable minds could disagree as to the amount of time the children should spend with Father in order to forge a meaningful relationship with him. *See, e.g., Sitz v. Sitz*, No. E2012-01726-COA-R3-CV, 2013 WL 5450416, at *4 (Tenn. Ct. App. Sept. 30, 2013) (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)) (holding that decisions about how to "fram[e] parenting plans" are reviewed for an abuse of discretion "whereby a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made'"). Moreover, even Preston admitted in his testimony that he "guess[ed]" that he would not oppose more

time with Father. Therefore, we decline to assign error to the trial court's treatment of this statutory factor.

Finally, regarding factor fourteen, the trial court found that "[a]s set forth above, both parties have made appropriate accommodations for the boys consistent with their work schedules." *See* Tenn. Code Ann. § 36-6-106(a)(14) (involving the parents' employment schedules). Mother merely states, "The court found this factor to be equal, despite Father's history of multiple military deployments." While Father indeed has a history of lengthy overseas deployments, he testified that he would not be deployed again in the near future. Nor does Mother explain why his military deployments should be held against him, when she, too, testified to a history of having to leave her children for extended periods for her military work. Therefore, the trial court did not err in finding this factor equal.

In sum, the trial court did not err in its assessment of any of the best interest factors. Although two factors favor Mother, it appears that the majority of the factors at issue do not favor either party in this case. Still, "[t]he best interest determination . . . does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. Rather, the relevancy and weight to be given each factor depends on the unique facts of each case." ***Drucker***, 2020 WL 6946621, at *12 (internal quotation marks and citation omitted). Based on these factors, the trial court concluded that Mother should still spend the majority of the time with the children, but that Father's time with the children should be increased. Given the trial court's findings about Father's ability to parent the children, Mother's sometimes unwillingness to facilitate a relationship with Father, and Preston's belief that Father does not want to spend time with him, we cannot conclude that the trial court abused its discretion in deciding that a material change in circumstances affecting the children's best interest warranted an increase in the time that Father is able to spend with the children.

It is important to emphasize that this conclusion "certainly should not be viewed as calling Mother's parenting skills into question." ***Armbrister***, 414 S.W.3d at 707. Rather, the proof establishes that Mother has been the primary parenting figure in the children's lives, at least since the divorce. "The modification does, however, allow Father to move closer to the statutory goal, which is to allow both parents to enjoy the 'maximum participation possible' in the lives of the[] children." ***Id.*** (quoting Tenn. Code Ann. § 36-6-106(a) []).

"Once a material change in circumstances affecting the children's best interests has been established, a court finally must utilize the process prescribed by [] section 36-6-404(b) to determine how the residential parenting schedule should be modified." ***Armbrister***, 414 S.W.3d at 706 (citation omitted). Under section 36-6-404(b), a court must first "determine whether either parent has engaged in any of the conduct described in

section 36-6-406,[10] which would necessitate limiting that parent's residential time with the child." *Id.* (citations omitted). "If section 36-6-406 does not apply, a court must then consider" the factors enumerated in section 36-6-106(a)(1)–(15). *Id.* (dealing with a prior version of section 36-6-404(b), which mandated consideration of substantially similar factors to those in section 36-6-106(a)); *see* Tenn. Code Ann. § 36-6-404(b) (effective July 1, 2014). Neither party has raised a specific issue as to the factors in section 36-6-406, so we will not tax the length of this Opinion with further consideration of those factors.

Although the bulk of Mother's argument as to the parenting plan focuses on the trial court's assessment of the above best interest factors, Mother also expresses some broad disagreement with the schedule imposed by the trial court—in other words, the details of the parenting plan. In the argument section of her brief, Mother specifically takes issue with the disruption that the schedule may cause and the trial court's decision to award Father more than his previously allotted sixty-five days of parenting time. In the facts section of her brief, Mother also takes issue with the Christmas vacation schedule imposed by the trial court.[11] We have previously addressed Mother's arguments as to possible disruption and the number of days allotted to Father in our consideration of the disputed best interest factors. In any event, we note that the details of a parenting plan are peculiarly within the trial court's broad discretion. *C.W.H.*, 538 S.W.3d at 495 (quoting *Armbrister*, 414 S.W.3d at 693). Here, after hearing all of the proof and considering the section 36-6-106 factors, the trial court determined that the revised plan was in the children's best interest. Mother has simply not met her burden to show that the trial court abused its discretion in implementing this plan.

#### CONCLUSION

The judgment of the Montgomery County Circuit Court is affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Kara Krulewicz, for which execution may issue if necessary.

---

[10] "Section [36-6-]406 sets forth circumstances that warrant imposing severe restrictions on a parent's visitation with their children." *Roberts v. Roberts*, No. W2016-01810-COA-R3-CV, 2017 WL 5634247, at *7 (Tenn. Ct. App. Nov. 22, 2017). Such circumstances include, for example, physical or sexual abuse and continued willful abandonment of the children. *See generally* Tenn. Code Ann. § 36-4-406.

[11] This court has generally held that arguments should be confined to the argument sections of appellate briefs. *See In re Est. of Storey*, No. W2017-00689-COA-R3-CV, 2018 WL 1151944, at *7 (Tenn. Ct. App. Mar. 5, 2018) (quoting *Freiden v. Alabaster*, No. 86186–2, 1990 WL 14562 (Tenn. Ct. App. Feb. 21, 1990), *perm. app. denied* (Tenn. June 11, 1990) (citing Tenn. R. App. P. 27)) ("This Court has previously held that it was inappropriate for a litigant to submit a brief where the statement of facts was 'interlaced and intertwined' with arguments of counsel."). Moreover, to the extent that Mother did raise the issue as to the particulars of the Christmas schedule, her argument is no more than skeletal. *See Sneed*, 301 S.W.3d at 615.

<u>s/ J. Steven Stafford</u>
J. STEVEN STAFFORD, JUDGE